Michael Allen LAMBERT, Appellant
(Petitioner below),

v.

STATE of Indiana, Appellee
(Respondent below).

No. 18S00–9702–PD–96.

Supreme Court of Indiana.

·March 5, 2001.

Rehearing Denied May 9, 2001.

Susan K. Carpenter, Public Defender of Indiana, Thomas C. Hinesley, Kathleen Cleary, Deputy Public Defenders, Indianapolis, IN, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Priscilla J. Fossum, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

Michael Allen Lambert was sentenced to death for the murder of a Muncie police officer. His conviction and sentence were upheld on direct appeal and on rehearing. We now affirm the denial of Lambert's petition for post-conviction relief, finding that this Court did not engage in what

Lambert calls "unconstitutional appellate sentencing," the post-conviction judge did not err by declining to disqualify himself, and Lambert's trial and appellate counsel were not ineffective.

### Background

Our earlier opinions in this matter describe in detail the crimes of which Lambert was convicted. In brief, Lambert shot Muncie Police Officer Gregg Winters five times in the back of the head on December 27, 1990. He was under arrest at the time of the shooting and was handcuffed and alone in the back of Winters's patrol car. A jury convicted Lambert of Murder[1] and the trial court sentenced him to death.[2]

We affirmed Lambert's conviction and sentence on direct appeal. *See Lambert v. State,* 643 N.E.2d 349 (Ind.1994). A second opinion, issued on rehearing, recognized that the trial court had improperly admitted victim impact evidence during sentencing but upheld Lambert's death sentence after independent review of the aggravating and mitigating circumstances. *See Lambert v. State,* 675 N.E.2d 1060 (Ind.1996), *cert. denied* 520 U.S. 1255, 117 S.Ct. 2417, 138 L.Ed.2d 181 (1997). Lambert petitioned for post-conviction relief and now appeals the denial of that petition.

### Discussion

Indiana law allows for collateral attack of a judgment of conviction and sentence through a petition for "post-conviction relief." *See Miller v. State,* 702 N.E.2d 1053, 1057 (Ind.1998), *cert. denied,* 528 U.S. 1083, 120 S.Ct. 806, 145 L.Ed.2d 679 (2000). This quasi-civil procedure "create[s] a narrow remedy for subsequent collateral challenges to convictions, which must be based on grounds enumerated in the post-conviction rules." *Williams v. State,* 724 N.E.2d 1070, 1076 (Ind.2000) (citations omitted), *cert. denied,* —— U.S.

---

1. *See* Ind.Code § 35–50–2–3 (Supp.1990).

2. *See id.* § 35–50–2–9.

——, 121 S.Ct. 886, 148 L.Ed.2d 793 (2001).

■ Under the post-conviction rules, the trial court must make findings of fact and conclusions of law on all issues presented in the petition. *See* Ind. Post Conviction Rule 1(6). Our review on appeal is of these findings and conclusions. *See Weatherford v. State*, 619 N.E.2d 915, 917 (Ind.1993). The post-conviction procedures do not provide a petitioner with a "super-appeal" or opportunity to consider freestanding claims that the original trial court committed error. Such claims are available only on direct appeal. *Williams*, 724 N.E.2d at 1076.

Although these principles are familiar, we cite them for a particular reason here. It is not our practice to use our opinions to critique the performance of counsel. We feel constrained, however, to say that Lambert's brief is for the most part organized and written with disrespect for these principles of post-conviction review. The brief consists of 83 pages of argument, the first 61 of which contain claims framed as trial court error. Only the final 22 pages and a seven-page supplemental brief challenge decisions of the post-conviction court. The final 22 pages and the supplemental brief incorporate by reference much of the material in the first 61 pages, sometimes in only the most general way. Briefs so organized and written hinder appellate review.

■ A petitioner who has been denied post-conviction relief—such as Lambert—appeals from a negative judgment. "This is because at the trial on the petition for post-conviction relief, the petitioner has the burden of establishing any grounds for relief by a preponderance of the evidence." *Miller*, 702 N.E.2d at 1058. *See also* Ind. Post Conviction Rule 1(5) ("The petitioner has the burden of establishing his grounds for relief by a preponderance of the evidence."). "When a petitioner appeals from a negative judgment, he or she must convince the appeals court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the trial court." *Miller*, 702 N.E.2d at 1058. Stated slightly differently, "[t]his Court will disturb a post-conviction court's decision as being contrary to law only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion." *Id.*

I

Lambert contends that his death sentence must be vacated because this Court acted without authority when we reweighed the aggravating and mitigating circumstances and affirmed the sentence. *See* Appellant's Br. at 72. He characterizes our opinion on rehearing as having "engag[ed] in appellate sentencing" contrary to constitutional safeguards and statutory procedures. *Id.* In this vein, Lambert asserts that: (1) the Indiana Constitution and Indiana statutes do not grant this Court authority or jurisdiction to impose a sentence; (2) our purported sentencing deprived him of his constitutional and statutory right to neutral appellate review; (3) the sentencing deprived him of his federally guaranteed due process right to a hearing prior to sentencing; and (4) this Court failed to follow the statutory procedures for sentencing.[3]

■ Our earlier opinion invoked our power to reweigh aggravating and mitigating circumstances after finding flaw in a trial court's sentencing process. *See Lam-*

---

3. The post-conviction court found that "claims of error committed by the Supreme Court are not even cognizable in a post-conviction relief proceeding." Appellant's App. at 57. The court noted that Lambert should have instead sought rehearing or petitioned the federal courts for a writ of habeas corpus or writ of certiorari. Alternatively, the court found that Lambert's specific claims were barred by *res judicata* because of the earlier rehearing opinion.

*bert v. State,* 675 N.E.2d 1060, 1065 (Ind. 1996).[4] As we noted in *Bivins v. State:*

> Where we find an irregularity in a trial court's decision to impose the death sentence, this Court has various options, as correctly noted by the defendant. Among these are: 1) to remand to the trial court for a clarification or new sentencing determination; 2) to affirm the death sentence if the constitutional error is harmless beyond a reasonable doubt; and 3) *to reweigh the proper aggravating and mitigating circumstances independently at the appellate level.*

642 N.E.2d 928, 957 (Ind.1994) (emphasis added). We have invoked this power in several death penalty cases. *See Matheney v. State,* 688 N.E.2d 883, 909–10 (Ind. 1997), *cert. denied,* 525 U.S. 1148, 119 S.Ct. 1046, 143 L.Ed.2d 53 (1999); *Bivins,* 642 N.E.2d at 957. *Cf. Bellmore v. State,* 602 N.E.2d 111, 129–30 (Ind.1992) (recognizing option of independent review but choosing instead to remand). As set forth above, Lambert's claim for relief on this issue is grounded in his assertion that it was beyond our authority under Indiana law to review the propriety of Lambert's sentence and affirm it after finding trial court sentencing error. We reaffirm that our review of and decision to affirm (or modify or reverse) a sentence under such circumstances is an exercise of our constitutional authority to "review and revise" sentences. Ind. Const. art. VII, § 4; *Bellmore,* 602 N.E.2d at 130 ("This Court has long recognized and exercised its authority under our state constitution and statutes to conduct an independent reweighing of aggravating and mitigating factors in determining the appropriateness of a death penalty.").

■ Lambert also contends that our decision on rehearing violated the federal Constitution. But the United States Supreme Court has explicitly approved this type of independent reweighing. For example, that Court has held that "[i]n a weighing State, when a reviewing court strikes one or more of the aggravating factors on which the sentencer relies, the reviewing court may, consistent with the Constitution, reweigh the remaining evidence or conduct a harmless error analysis." *Parker v. Dugger,* 498 U.S. 308, 319, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). *See also Clemons v. Mississippi,* 494 U.S. 738, 741, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

II

Lambert contends that the post-conviction court's judgment must be vacated and new post-conviction relief proceedings ordered because the judge erroneously declined to disqualify himself. Lambert maintains that the post-conviction judge—who also presided over Lambert's trial—demonstrated disqualifying bias through statements he made during the sentencing phase of the original trial. He also argues that the judge could not act as a neutral factfinder on issues related to the presence of uniformed officers in the courtroom during the original trial and sentencing because the judge himself observed the officers. The post-conviction court denied Lambert's motion for a new judge, concluding that "these facts do not support a rational inference of bias or prejudice." (R.P–C.R. at 176.)

■ First, Lambert argues that the post-conviction judge demonstrated disqualifying bias through the following eight statements he made during the original trial: (1) "This act clearly was not the result of, or caused [by,] alcohol. This was

---

4. The propriety of reweighing the aggravating and mitigating circumstances was questioned by one member of the Court in the earlier opinion. *See Lambert,* 675 N.E.2d at 1067 (Boehm, J., dissenting). *But cf. Matheney v. State,* 688 N.E.2d 883, 911 (Ind.1997) (Boehm, J., concurring) ("I do not believe I should refrain from participation in the re-weighing exercise directed by the majority on the ground that I would not have designed the process to include it. For that reason I concur in all portions of the opinion [and] concur in result as to part III.... Having explained this position, I do not expect to find it necessary to reiterate it in future cases....").

the product of a wicked mind"; (2) "The Defendant's response was, in my judgment, indicative of a very serious character defect manifested by one who is bent on violence"; (3) "His act was totally and completely depraved"; (4) "[I]n this case, for one so young to react so viciously and so violently is, I think, evidence of a malignant character"; (5) "Even though the Defendant was only twenty (20) years of age at the time of the act, he had already become a ruthless individual without conscience, and without regard for the consequences of his actions"; (6) "It seems to me that it takes a special type of individual to deliberately kill a policeman. It takes a person without respect for authority, for the law, or for human life itself"; (7) "In the Court's judgment, the only possible mitigating circumstances in this tragic affair are the age of the Defendant and the fact that, although not likely, rehabilitation is always a possibility"; (8) "[T]his was an intentional and deliberate execution." (Supplemental Record of Post–Conviction Proceedings at 1–3).

■ Under Post–Conviction Rule 1(4)(b),[5] a "petitioner may request a change of judge by filing an affidavit that the judge has a personal bias or prejudice against the petitioner." The rule "requires the judge to examine the affidavit, treat the historical facts recited in the affidavit as true, and determine whether these facts support a rational inference of bias or prejudice." *State ex rel. Whitehead v. Madison County Cir. Ct.*, 626 N.E.2d 802, 803 (Ind.1993). "[A] change

5. Indiana Criminal Rule 12(B) is to the same effect:

> In felony and misdemeanor cases, the state or defendant may request a change of judge for bias or prejudice. The party shall timely file an affidavit that the judge has a personal bias or prejudice against the state or defendant. The affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be accompanied by a certificate from the attorney of record that the attorney in good faith believes that the historical facts recited in the affidavit are true. The request shall be granted if the

of judge is neither 'automatic' nor 'discretionary,' [but] calls for a legal determination by the trial court." *Sturgeon v. State*, 719 N.E.2d 1173, 1181 (Ind.1999). However, we presume that a judge is not biased against a party. *See Taylor v. State*, 587 N.E.2d 1293, 1303 (Ind.1992). *Cf. In re Adoption of Johnson*, 612 N.E.2d 569, 572 (Ind.Ct.App.1993) ("Judges are credited with the ability to remain objective notwithstanding their having been exposed to information which might tend to prejudice lay persons."), *transfer denied.*

■ Under the rule, the post-conviction court is disqualified from hearing a case only if the judge holds "a *personal* bias or prejudice." Ind. Post–Conviction Rule 1(4)(b) (emphasis added). Typically, a bias is "personal" if it stems from an extrajudicial source—meaning a source separate from the evidence and argument presented at the proceedings. *See, e.g., Noble v. State*, 725 N.E.2d 842, 847–49 (Ind.2000) ("Generally, a trial judge's exposure to evidence *through judicial sources* is, alone, insufficient to establish bias.") (emphasis added); *Sturgeon*, 719 N.E.2d at 1181–82 (Ind.1999) (same). *Cf. Harrison v. State*, 707 N.E.2d 767, 790 (Ind.1999) ("A trial court's adverse rulings on judicial matters do not indicate a personal bias toward a defendant that calls into question the trial court's impartiality."), *cert. denied*, 529 U.S. 1088, 120 S.Ct. 1722, 146 L.Ed.2d 643 (2000). As the United States Supreme Court noted in interpreting a federal rule similar to our own:[6]

> historical facts recited in the affidavit support a rational inference of bias or prejudice.
> We treat the prejudice and bias analysis under each the same.

6. The federal rule states that:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The judge who presides at a trial may, upon the completion of the evidence, be exceedingly illdisposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.... "Impartiality is not gullibility. Disinterestedness does not mean childlike innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *Also not subject to deprecatory characterizations as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings.*

*Liteky v. United States,* 510 U.S. 540, 550–51, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (emphasis added) (citations omitted).[7]

This case closely resembles *Hollins v. State,* where we upheld a murder conviction despite similar judicial statements during sentencing:

A trial judge's comments [during sentencing] necessarily reflect the evidence he or she hears during the trial. Trial judges may consider the conduct and attitude of the defendant when imposing sentence. In fact, most of the above comments stem from the considerations *mandated* by Indiana's sentencing stat-

ute. In view of the nature and circumstances of the defendant and the crimes, the trial judge's comments on the coldness of the defendant, his lack of remorse, and his proclivity to kill again were entirely consistent with the considerations required to be taken into account by the judge in determining the defendant's sentence. The comments do not reflect disqualifying personal bias or prejudice against the defendant.

679 N.E.2d 1305, 1307 (Ind.1997) (emphasis in original).

 The statements made during Lambert's sentencing were part of the judge's judicial function and did not stem from an extrajudicial source. *See, e.g., Noble,* 725 N.E.2d at 847–49. The trial court's probing of Lambert's character and the circumstances of his crime was unavoidable. The Eighth Amendment requires a judge to make "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime" before imposing a sentence of death. *Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (emphasis in original). The fact that the judge used emotional language[8] in describing Lambert's character and crime does not demonstrate personal bias or prejudice outside of the judicial function.

 Second, Lambert contends that the post-conviction judge was unable to make impartial findings of fact or conclusions of law in regards to his claims relating to the presence of uniformed,

---

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists....

28 U.S.C. § 144 (1995). *See also* 28 U.S.C. §§ 455(a) and (b) (1995).

**7.** *See also Smith v. State,* 613 N.E.2d 412, 414 (Ind.1993) (finding no rational inference of bias or prejudice where judge had received adverse publicity for granting post-conviction relief in a related case); *Jackson v. State,* 643 N.E.2d 905, 907 (Ind.Ct.App.1994) (finding no rational inference of bias or prejudice where judge had previously revoked the petitioner's probation in a separate matter when

the judge served as a probation officer), *transfer denied.*

**8.** A judge does not show bias by recognizing the emotional, human elements of a case. *See, e.g., Smith v. State,* 718 N.E.2d 794, 802 (Ind.Ct.App.1999) ("Undisputedly, the trial judge acknowledged the inevitable human reaction to a situation where a very young child dies of preventable causes while in her mother's care. In doing so, Judge Craney simply revealed her humanity, a quality which each member of the judiciary and bar should respect. Such a revelation does not rise to the level of bias or prejudice."), *transfer denied.*

armed police officers during trial and sentencing. He argues that the post-conviction judge "could not sit as a neutral factfinder because his personal views of what occurred in his courtroom [at trial] destroyed his ability to receive evidence on that very subject in a detached fashion. His recollection could not be tested by the adversarial process." Appellant's Br. at 88. Lambert does not explain why the post-conviction court's personal views concerning officers in the trial courtroom would impermissibly bias his ability to receive evidence on post-conviction review. We see no reason why the post-conviction judge's personal views towards the police officer claims would affect his impartiality more than *any* other claim that relates to events at trial. Taking Lambert's arguments on this point to their logical extreme would mean that a judge who tries the original case could not sit as the judge of a collateral proceeding because "his personal view of what occurred in his courtroom [would have] destroyed his ability to receive evidence on that very subject." Appellant's Br. at 88. We rejected such a per se approach to motions for a change of judge in *State ex rel. Whitehead v. Madison County Circuit Court*, 626 N.E.2d 802, 803 (Ind.1993), and we reaffirm that holding here. *See also State ex rel. Rondon v. Lake Superior Court, Criminal Div. Two*, 569 N.E.2d 635, 636 (Ind.1991) (DeBruler, J. dissenting) ("The rule rejects the proposition that there should be an automatic change of venue in post-conviction cases.").[9] Lambert is not entitled to a change of judge simply because the post-conviction judge presided over the original trial and sentencing.

**III**

Lambert contends that his conviction and death sentence must be vacated because counsels' performance at trial was so deficient that it denied him the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the federal constitution.[10] To establish ineffective assistance of counsel, Lambert must show that (1) counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As for the first component of an ineffective assistance claim—counsel's performance—we have noted that "[c]ounsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference. A strong presumption arises that ·counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Holmes*, 728 N.E.2d 164, 172 (Ind.2000).[11] As for the second prong, the Supreme Court has recently reaffirmed the *Strickland* standard for prejudice in ineffective assistance of counsel claims. In *Williams v. Taylor*, the Court held that in most circumstances deficient performance of counsel will only be prejudicial when " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

---

**9.** The DeBruler dissent was adopted in *Whitehead*, 626 N.E.2d at 803.

**10.** Lambert raised most of these same issues as freestanding claims of trial court error. As freestanding claims of trial court error, they must be raised on direct appeal and are not available in collateral proceedings. *See* introduction to *Discussion* and Part VI *infra*.

**11.** *See also Canaan v. State*, 683 N.E.2d 227, 231 (Ind.1997) ("Judicial scrutiny of counsel's performance is highly deferential; we eschew second-guessing the propriety of trial counsel's tactics."); *Potter v. State*, 684 N.E.2d 1127, 1133 (Ind.1997) ("A reviewing court must grant the trial attorney significant deference in choosing a strategy which, at the time and under the circumstances, he or she deems best.").

probability sufficient to undermine confidence in the outcome.' " 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

A substantial number of the errors Lambert asserts were committed by his counsel are claims that counsel did not interpose certain objections or failed to tender certain jury instructions. In almost all of these situations, the post-conviction court made findings of fact from which it concluded that the objection in question would have been overruled or the instruction in question would have been refused. As discussed in greater detail *supra,* we will reverse "a post-conviction court's decision as being contrary to law only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion." *Miller v. State,* 702 N.E.2d 1053, 1057–58 (Ind.1998), *reh'g denied.*

■■■■ Given this standard of review, once a post-conviction court makes findings of fact from which it concludes that an objection would have been overruled or an instruction would have been refused, we first examine whether the evidence supports the findings of fact. If it does, then the post-conviction court's conclusion will be reversed only if those findings dictate that under applicable law, the objection was required to be sustained or instruction required to be given. So long as under applicable law, the trial court could have overruled the objection or refused the instruction, the post-conviction court's conclusion that the trial court would have done so will be affirmed.

### A

Lambert contends that his trial counsel were ineffective for failing to object to the presence of uniformed, armed police officers in the courtroom during trial.[12] Lambert argues that the presence of the officers pressured the jury to convict and the judge to sentence him to death. As such, he argues that trial counsel should have moved to restrict the officers' appearance. The State counters that Lambert was not prejudiced by the presence of the officers because the jury box faced away from the gallery, the judge excluded "signs of mourning" from the courtroom, and the defendant had a strategic reason for not excluding the officers in that he did not want to anger the law enforcement officers that he would later call to the stand.

■■ The post-conviction court made certain findings of fact from which it concluded that trial counsels' performance was not deficient for failing to object to the officers because such an objection would have been overruled. Appellant's Appendix at 60 ("Counsel need not have moved for exclusion of uniformed police officers from the courtroom because the officers had a right to be present and their presence did not render the proceeding fundamentally unfair or the result inherently unreliable."). The post-conviction court found that: (1) "There were uniformed Muncie Police officers present among the spectators in the gallery during trial, but counsel made no objection to their presence"; (2) "[Trial counsel] remembers that the audience was usually about 1/4th police officers, though other evidence indicates that the number of uniformed officers exceeded twenty during the penalty phase and sentencing"; (3) "The layout of the courtroom shows that while seated in the jury box, jurors had their backs to the officers in the gallery and were even separated from the gallery by a half-wall and a

---

12. Lambert phrases much of this argument in terms of his attorneys' failure to cite relevant authority to support his motion for a change of venue. However, as we noted on direct appeal, "[t]here is no evidence in this record to support appellant's claim that the trial court erred in denying his motion for change of venue or change of venire." *Lambert v. State,* 643 N.E.2d 349, 352 (Ind.1994). Since we have already held that Lambert was not entitled to a change of venue, he cannot now claim that his counsel were ineffective for failing to obtain such a change.

transparent glass shield that rose up above that half-wall"; (4) "The officers did not brandish their weapons or engage in any other threatening gestures to the jury or judge." Appellant's Appendix at 15–16.

There was evidence to support the post-conviction court's findings of fact. Lambert introduced a videotape and diagram of the courtroom demonstrating that the room is as described by the post-conviction court. Lambert's lead trial counsel also described the room as containing a glass barrier between the jury and the spectators. He compared the glass barrier to one found in a hockey rink and testified that it would "[p]resumably ... keep any noise from the gallery from affecting the jury." (R.P–C.R. at 1253) He also testified that the jurors faced away from the audience so that "once the jury was seated, they did not have a view of the gallery...." He testified that he could not recall any disruptions by the officers and Lambert's second counsel testified that the officers did not brandish or show off their weapons. The second counsel also testified that the officers typically composed a quarter to a third of the audience and that six to eight officers attended the trial on most days, with the number rising to about fifteen during important phases of the trial.

■ Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. "When an ineffective assistance of counsel claim is based on trial counsel's failure to make an objection, the appellant must show that a proper objection would have been sustained by the trial court." *Lloyd v. State,* 669 N.E.2d 980, 985 (Ind.1996). Because the post-conviction court's conclusion that the trial court would have overruled an objection to the presence of the officers was supported by the evidence, we will uphold the post-conviction court if the trial court could have overruled the objection under applicable law. That is, we will reverse the post-conviction court only if the trial court was compelled as a matter of law to sustain an objection. We have repeatedly held that control over spectators in a courtroom is a matter of trial court discretion. *See, e.g., Hill v. State,* 497 N.E.2d 1061, 1067 (Ind.1986) ("The trial judge has discretion to determine whether the defendant has been prejudiced by a spectator's conduct."); *Dudley v. State,* 480 N.E.2d 881, 901 (Ind.1985) (finding no abuse of discretion for trial court's refusal to grant a mistrial because of the presence of uniformed police officers during juror examination); *Palmer v. State,* 153 Ind.App. 648, 667, 288 N.E.2d 739, 751 (1972) ("The court has wide discretion in determining whether a party litigant has been prejudiced by ... an atmosphere created by spectators in the courtroom and it is *solely within his province* and his duty to determine if the party has been prejudiced ....") (emphasis added). As such, the trial court here had latitude to decide whether to restrict the officers' appearance. We cannot say that the trial judge would have abused that discretion as a matter of law by denying a motion to restrict the officers. The judge had already granted Lambert's motions to prohibit any signs of mourning in the courtroom. The jurors were aware that the trial focused on the murder of a police officer and likely would have expected the victim's fellow officers to follow the trial. *See, e.g., Smith v. Farley,* 59 F.3d 659, 664 (7th Cir.1995) ("Of course if you kill a policemen and are put on trial for the crime, you must expect the courtroom audience to include policemen...."); *Brown v. State,* 256 Ind. 444, 446, 269 N.E.2d 377, 378 (1971) ("All citizens are well aware of the fact that many officers wear uniforms and carry arms. Their presence in court rooms is a common occurrence. We know of no manner in which it could be determined whether the fact they are in uniform helps, hinders or is of no consequence to the State's case."). The record demonstrates that the jurors faced away from the gallery during testimony and argument. And there is no evidence of a directed

effort to prejudice the jury or of any disturbance by the police officers. *Cf. Smith,* 59 F.3d at 664 ("Efforts by spectators at a trial to intimidate judge, jury, or witnesses violate the most elementary principles of a fair trial.") (citations omitted).[13] Because the trial court could have denied a motion to restrict the officers, the post-conviction court could properly find that Lambert was not denied the effective assistance of counsel on this issue.

### B

▮ Lambert next argues that trial counsel were ineffective for failing to keep out of evidence both a videotaped demonstration of the shooting and pictures of Officer Winters with family members. Lambert argues that these exhibits prejudiced the jury through "undue emotion." Appellant's Br. at 54. As for the demonstration, this Court held on direct appeal that the trial court was within its discretion to admit the videotape. *See Lambert v. State,* 643 N.E.2d 349, 353 (Ind.1994). As it was in the court's power to admit the videotape, Lambert's counsel was not ineffective for failing to keep it out of evidence.

▮ Second, Lambert argues that counsel should have objected to the admission of photographs of the victim with family members. The post-conviction court concluded that "the propriety of victim-impact evidence was decided on direct appeal and may not be relitigated in this proceeding. The claim of prosecutor misconduct involving a photo of the victim's family is *res judicata* as it is encompassed within the decided issue." Appellant's Appendix at 43–44. We agree that these photographs were part of the "victim impact evidence" that our rehearing opinion

held was inadmissible. *Lambert v. State,* 675 N.E.2d 1060, 1064 (Ind.1996). In our rehearing opinion, we specifically referred to at least one of the photographs in describing what the impermissible "victim impact" evidence was: "[Molly Winters] was permitted to lay a foundation for admission into evidence of a photo of the family taken the previous Christmas." *Id.* at 1062. While, as Lambert notes, the actual photos were not included in the trial record because of their size, our rehearing opinion reflects our acknowledgement of these photographs and our inclusion of them under the rubric of "victim impact evidence." As such, we have already determined that these photographs should not have been admitted during the penalty phase. We then reweighed the aggravating and mitigating circumstances and upheld the death sentence. *Id.* These issues were thus fully litigated on direct appeal and rehearing. We affirm the post-conviction court's determination that *res judicata* bars this claim.

### C

Lambert claims that his counsel were ineffective for failing to object to numerous comments the prosecutor made during argument in both the guilt and penalty phases. He contends that his counsel should have objected to argument that: (1) disparaged Lambert's character; (2) disparaged his defense strategy; (3) quoted testimony that Lambert called Winters "a pig"; (4) noted Lambert's laughter during trial; (5) stated that Winters struggled for eleven days before dying; (6) emphasized the number of police officers in attendance and included a poem about fallen police officers; (7) suggested that the aggravator of killing a police officer should always

---

**13.** We also recognize that an objection to the presence of the officers would cut against the general principle that court proceedings should be open to all members of the public. *See, e.g.,* Ind. Const. art. I, § 13 ("In all criminal prosecutions, the accused shall have the right to a public trial...."), *Williams v. State,* 690 N.E.2d 162, 167 (Ind.1997) ("The right to a public trial has long been recognized as a fundamental right of the accused.... It protects the accused by allowing the public to assess the fairness of the proceedings. In addition, it encourages witnesses to come forward, and discourages perjury.").

override the mitigating evidence presented; and (8) mentioned Lambert's juvenile delinquency adjudication.

We note initially the general rule that

> To prove ineffective assistance for failure to object to the State's closing argument, a defendant must prove that his objections would have been sustained, that the failure to object was unreasonable, and that he was prejudiced. During closing argument, a "prosecutor may argue both law and facts and propound conclusions based upon his or her analysis of the evidence. It is proper to state and discuss the evidence and all reasonable inferences to be drawn therefrom, provided the prosecutor does not imply personal knowledge independent of the evidence."

*Potter v. State,* 684 N.E.2d 1127, 1134 (Ind. 1997) (quoting *Marsillett v. State,* 495 N.E.2d 699, 708 (Ind.1986)) (citations omitted). Based on these principles, the post-conviction court stated in its conclusions of law that

> Counsel need not have interposed objections or made other requests for relief in response to the prosecutor's closing argument in the guilt phase. The argument was appropriate. Moreover, regardless of whether the remarks were in fact objectionable, counsel could have determined as a matter of strategy to rely upon his own closing argument to rebut the prosecutor rather than object and risk giving undue emphasis to the prosecutor's remarks.

Appellant's Appendix at 63 (citations omitted). *See also* Appellant's Appendix at 68 ("Because the prosecutor's closing argument in the penalty and sentencing hearings was proper ... counsel need not have objected or sought curative measures."). Viewed in the respective contexts in which the prosecutor's comments were made, we conclude that the post-conviction court's findings support these conclusions.

■ First, the post-conviction court made certain findings of fact from which

it concluded that trial counsel's performance was not deficient for failing to object to "fourteen different derogatory and inflammatory references to Lambert" made by the prosecutor. Appellant's Br. at 56. The post-conviction court concluded that trial counsel were not ineffective because an objection to these comments would not have been successful. Appellant's Appendix at 63, 68. ("The [prosecutor's] argument was appropriate.") The post-conviction court found that the prosecutor's closing argument "included characterizations of Lambert as an 'assassin' and 'executioner' and of his crime as 'cold-blooded' and 'ruthless,' etc. One theme of the prosecutor's argument was that Lambert intentionally murdered Officer Winters...." Appellant's Appendix at 8–9.

Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. "As a general proposition, the prosecutor must confine closing argument to comments based upon the evidence presented in the record. The prosecutor may argue both law and facts and propound conclusions based upon his or her analysis of the evidence." *Marsillett,* 495 N.E.2d at 708. Each of these comments was based on specific evidence in the record and an objection would not have been sustained even if counsel had made one. *See Brennan v. State,* 639 N.E.2d 649, 652–53 (Ind.1994) (rejecting ineffective assistance of counsel claim for trial counsel's failure to object when the prosecutor called defendant "a cold-blooded killer" during argument). For example, Lambert contends that the prosecutor committed misconduct by calling him an "assassin" and "gutless." (R. at 5791.) However, these comments arose when the prosecutor questioned Lambert's level of intoxication and argued that Lambert intended to kill Winters. In this context, the prosecutor contrasted Lambert's shooting of the defenseless Winters with his acquiescence to Kirk Mace, the arresting officer:

This wasn't an act of pulling a gun out. It was calculated, thought-out, intentional maneuver to put the gun to the back of Gregg's head. It was not a random pulling out of a gun and shooting.

Well, if he's able to do this, why doesn't he shoot Kirk Mace. He didn't shoot Kirk Mace because Kirk Mace never turned his back on him. *He is truly the assassin. He is gutless.* Kirk Mace was facing him. He didn't have the guts to take on Kirk Mace.

(*Id.*) (emphasis added). For these reasons, the trial court could properly have overruled a defense objection to the prosecutor's statements. Moreover, Lambert's defense counsel could have reasonably decided that objecting to these individual negative comments, which were interspersed at different places in the argument, would draw undue attention to them. This choice was a reasonable strategic decision. *See Monegan v. State,* 721 N.E.2d 243, 254 (Ind.1999) (finding a reasonable strategic decision not to object to prosecutor's statement that "[I] guess he gets high off of hurting people and killing people"; "[C]ounsel could well have decided to let these brief references pass. In such circumstances, we cannot conclude that Defendant received ineffective assistance of counsel.").

■ Second, the post-conviction court made certain findings of fact from which it concluded that trial counsels' performance was not deficient for failing to object to comments disparaging Lambert's defense strategy and suggesting he lacked remorse. Again, the post-conviction court concluded that the trial court would not have sustained an objection. Appellant's Appendix at 63, 68. To support this con-

clusion, the court found that "the prosecutor's argument was that ... [Lambert] was not being truthful about what he remembered of the shooting, that the defense expert's opinion was based on Lambert's self-serving recollection of events and that the jury should not, therefore, believe the defense." Appellant's Appendix at 9.

Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. "When an ineffective assistance of counsel claim is predicated on counsel's failure to make an objection, appellant must show that a proper objection would have been sustained by the trial court." *Jones v. State,* 536 N.E.2d 267, 272 (Ind.1989). The trial court could have overruled an objection to the comments Lambert contests. The prosecutor used the comments to make his case against Lambert's witnesses and their credibility. For example, the remark that Lambert's testimony was "self-serving, convenient, and unbelievable" (R. at 5754) was made as the prosecutor attacked Lambert's memory loss and argued that he intended to kill Winters. Placed in context, these comments were argument based on the facts in evidence.[14] Moreover, defense counsel could reasonably have decided "to let these brief references pass." *Monegan,* 721 N.E.2d at 254. The trial court would have been within its discretion to overrule an objection to these comments.

■ Third, the post-conviction court made certain findings of fact from which it concluded that trial counsels' performance was not deficient for failing to object when the prosecutor said that Lambert called Winters "just a pig."[15] The post-convic-

14. *Cf. Timberlake v. State,* 690 N.E.2d 243, 254 (Ind.1997) ("[D]efendant argues that the prosecutor committed misconduct during opening argument by stating that the shooting was a 'mean, senseless, intentional act, the act of a man who hated authority, who hated the uniform and everything it stood for'"; "In each alleged situation, the prosecutor made accurate and true statements based

upon the evidence and the situation. The prosecutor never implied that he had knowledge which the jury did not, nor did he stray from the evidence and reasonable interpretations derived therefrom. There was no misconduct."), *cert. denied,* 525 U.S. 1073, 119 S.Ct. 808, 142 L.Ed.2d 668 (1999).

15. This disputed testimony will be discussed in detail *infra.*

tion court concluded that the trial court would not have sustained an objection. Appellant's Appendix at 63, 68. To support this conclusion, the court found that a witness testified "that when he asked Lambert how he could just take a life, Lambert responded, 'It was just a pig.'" Appellant's Appendix at 7.

Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. Here, the prosecutor quoted directly from the witness's testimony and the prosecutor used the comment in the context of describing Lambert's intent to kill. An objection to this comment need not have been sustained.

■ Fourth, the post-conviction court made certain findings of fact from which it concluded that trial counsel's performance was not deficient for failing to object to the prosecutor's reference to Lambert's laughter during the trial.[16] The post-conviction court concluded that trial counsel could have made reasonable strategic decisions not to object during closing argument. Appellant's Appendix at 63. The findings, while not specifically mentioning Lambert's laughter, refer to the prosecutor's arguments that Lambert lacked remorse and that "Lambert had not apologized...." Appellant's Appendix at 9.

Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. This comment was an isolated occurrence and Lambert's counsel could reasonably have decided not to draw undue attention to it. *See Conner v. State,* 711 N.E.2d 1238, 1250 (Ind.1999) ("By choosing not to object to ... the State's closing argument, defense counsel avoided drawing attention to testimony or argument unfavorable to the defendant. This was a legitimate strategy."), *cert. denied,* — U.S. ——, 121 S.Ct. 81, 148 L.Ed.2d 43 (2000). As part of this tactical

decision, Lambert's counsel worked the laughter into his attempts to humanize Lambert during sentencing: "[Y]ou have seen Mike maybe smile just as you people have smiled from time to time. You have seen him cry just as you have cried from time to time. It's because he's a human being. He's got feelings...." (R. at 5975.)

■ Fifth, the post-conviction court made certain findings of fact from which it concluded that trial counsels' performance was not deficient for failing to object to the prosecutor's statement that Winters struggled for eleven days. The post-conviction court concluded that the trial court would not have sustained an objection. Appellant's Appendix at 63, 68. The post-conviction court found that the "prosecutor also pointed out ... that Officer Winters was a family man who did not have a chance to defend himself but who struggled for 11 days after being shot." Appellant's Appendix at 9.

Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. The comment arose in the context of the prosecutor's argument to the jury that Lambert's actions *caused* Winters's death. The prosecutor was required to prove causation and as such this statement was proper argument.

■ Sixth, the post-conviction court made certain findings of fact from which it concluded that trial counsels' performance was not deficient for failing to object to the prosecutor's penalty phase reference to the presence of uniformed, armed police officers and to his recitation of a poem that paid tribute to slain police officers. The post-conviction court concluded that the trial court would not have sustained an objection. Appellant's Appendix at 63, 68. To support this conclusion, the post-conviction court found that

---

16. Defense counsel's penalty phase argument also noted that Lambert had laughed at times

during the six-day trial.

The prosecutor urged that killing a law enforcement officer is an aggravating factor entitled to great weight because of the important societal interest in protecting police, and that a person who kills an officer is particularly dangerous. In support of his argument, the prosecutor quoted from then-Justice Rehnquist's opinion in *Roberts v. Louisiana* discussing the importance of protecting police officers. The prosecutor closed the opening portion of his penalty phase argument by reciting a poem about the death of a police officer.

Appellant's Appendix at 12 (citations omitted). The post-conviction court also found that the prosecutor struck a theme that "likened police officers to soldiers at war. But this comment followed the Rehnquist quotation, which describes policemen as 'foot soldiers of society's defense of ordered liberty,' as well as defense counsel's own description of police officers as 'soldiers'...." Appellant's Appendix at 12–13.

Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. The poem and the comments on the police officers' presence were linked to the prosecutor's penalty phase case. These arguments stemmed from the prosecutor's burden to show that the sole aggravator—the killing of a police officer in the line of duty—outweighed Lambert's mitigating evidence. As part of his effort to strengthen this aggravator, the prosecutor could be expected to make arguments based on the unique duties and dangers inherent in police work. *Cf. Smith v. Farley,* 59 F.3d 659, 664 (7th Cir.1995) ("[W]e cannot say that this single, ambiguous sentence in a long closing argument created an atmosphere of intimidation merely because of the presence of some policemen in

the courtroom as spectators."). While these comments "pushed the bounds of zealous advocacy,"[17] the trial court was not required to sustain an objection to them.[18]

■ Seventh, the post-conviction court made certain findings of fact from which it concluded that trial counsels' performance was not deficient for failing to object to what Lambert characterizes as the prosecutor's suggestion that the aggravator of killing a police officer always overrides mitigating evidence. As previously mentioned, the post-conviction court found that the prosecutor "urged that killing a law enforcement officer is an aggravating factor entitled to great weight because of the important societal interest in protecting police, and that a person who kills an officer is particularly dangerous." Appellant's Appendix at 12.

Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. First, while Lambert's argument here is essentially that the prosecutor misstated the law—that in every case, this aggravating circumstance will override any and all mitigating evidence—it is not at all clear that that was the prosecutor's argument. It is equally susceptible to a reading that the killing of the police officer here overrode the mitigating evidence presented here. Second, defense counsel may make a reasonable strategic choice to not object to a comment made during closing argument in order to avoid drawing undue attention to the comment. *See Conner,* 711 N.E.2d at 1250 ("By choosing not to object to ... the State's closing argument, defense counsel avoided drawing attention to testimony or argument unfavorable to the defendant. This

---

**17.** *Charlton v. State,* 702 N.E.2d 1045, 1051 (Ind.1998), *reh'g denied.*

**18.** Defense counsel attempted to defuse these statements during their own closing:

I agree with Mr. Reed. Police officers. I have a high very, very, high regard for. They do get out there, they put their lives on the

line for people like us. And we've got a tragedy. We lost one, a very good one.

Mike deserves to be punished for it. Oh yeah. Does he need to be killed? Is that what it takes?

(R. at 5974.)

was a legitimate strategy."). This comment was a brief passage in an otherwise lengthy argument. It would have been reasonable for counsel to choose not to draw undue attention to it, especially since the jury instructions and defense counsel's own argument undercut the force of the comment.[19]

■ Finally, the post-conviction court made certain findings of fact from which it concluded that trial counsels' performance was not deficient for failing to object when the prosecutor made a reference to Lambert's juvenile delinquency adjudication and juvenile crimes. The post-conviction court concluded that the trial court would not have sustained an objection. Appellant's Appendix at 63, 68. The post-conviction court found that "the prosecutor referred to Lambert's delinquency adjudication, but Lambert himself had presented evidence of his childhood generally and his delinquency adjudication specifically." Appellant's Appendix at 12 (citations omitted).

Our review of the record indicates that there was evidence to support the post-conviction court's findings of fact. The record reflects that when Lambert was a minor he was adjudicated to be a juvenile delinquent because of a burglary in Farmland, Indiana, and was also convicted of underage drinking. Although the trial court had earlier ruled that the State could not introduce this evidence, *Lambert* presented it during his penalty phase case. Lambert argued that the fact that he had no significant criminal history was a miti-gating circumstance to the imposition of a death sentence.

Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. The prosecutor only used this evidence to rebut the mitigator of no significant criminal history. An objection to it need not have been sustained.

### D

Lambert claims that he was denied the effective assistance of counsel because his trial counsel failed to offer a series of jury instructions. He asserts that his counsel should have proposed instructions on: (1) missing evidence because the State never produced a videotape of his statement to the police; (2) the questionable credibility of one of the State's witnesses; and (3) the fact that the videotaped demonstration did not reflect Lambert's mental state at the time of the shooting.[20] The post-conviction court concluded that "[b]ecause the instructions ... were not warranted, counsel performed competently despite not requesting them." Appellant's Appendix at 49–51, 64.

■ We note as an initial matter that the post-conviction court concluded that even had counsel tendered these instructions, the trial court would not have given them. If we find that this conclusion was supported by the evidence, we will uphold the post-conviction court if the trial court could have properly refused the instruction under applicable law. That is, we will reverse the post-conviction court only if the trial court was compelled as a

---

19. During the penalty phase arguments, defense counsel stated that "each of one of you in *your own heart* is going to have to weigh mitigation against that aggravator and come to *your own individualized decision* as to whether or not that aggravator so outweighs the mitigators that it justifies the taking of a life." (R. at 5974) (emphasis added). The instructions further told the jury to "consider *both* aggravating and mitigating circumstances and recommend whether the death penalty should be imposed." (R. at 5982–83) (emphasis added).

20. Lambert also argues that his counsel were ineffective for failing to obtain an instruction on voluntary manslaughter. However, we held on direct appeal that Lambert was not entitled to this instruction. *Lambert v. State*, 643 N.E.2d 349, 354 (Ind.1994) ("The trial court did not err in refusing to give a voluntary manslaughter instruction."). Because Lambert was not entitled to the instruction, his counsel were not ineffective for failing to obtain it.

matter of law to give the instruction. "[F]ailure to submit an instruction is not deficient performance if the court would have refused the instruction anyway." *Williams v. State,* 706 N.E.2d 149, 161 (Ind.1999), *cert. denied,* 529 U.S. 1113, 120 S.Ct. 1970, 146 L.Ed.2d 800 (2000). A trial court may not accept a tendered instruction unless it correctly states the law, is supported by evidence in the record, and is not covered by other instructions. *See Sherwood v. State,* 702 N.E.2d 694, 698 (Ind.1998), *reh'g denied; Sweany v. State,* 607 N.E.2d 387, 389 (Ind.1993). Under this standard, we affirm the post-conviction court's conclusion that trial counsel would not have obtained these instructions even if they had sought them.

■ First, the post-conviction court made certain findings of fact from which it concluded that trial counsels' performance was not deficient for failing to offer a "missing evidence" instruction in regards to the fact that the State never presented a videotape of Lambert's statement to the police. The post-conviction court concluded that the trial court would not have given this instruction even if counsel sought it. Appellant's Appendix at 49, 63–64. To support this conclusion, the post-conviction court found that "[t]he statement was typed but not videotaped by police." Appellant's Appendix at 3.

■ Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that counsel were not deficient for not seeking this instruction. Parties are not entitled to an instruction that is not supported by the evidence. *See Sherwood,* 702 N.E.2d at 698. Because there was no evidence that a videotape existed, Lambert's counsel were not deficient for failing to offer the instruction. We affirm the post-conviction court's conclusion that the trial court would not have granted this instruction.

■ Second, the post-conviction court made certain findings of fact from which it concluded that trial counsel's performance was not deficient for failing to seek an instruction for the jury to spend special care in weighing witness Richard Garske's credibility.[21] The post-conviction court concluded that this instruction was not supported by the law and would not have been given even if sought by trial counsel: "It would have been inappropriate for the court's instruction to single out the testimony of a particular witness for special scrutiny." Appellant's Appendix at 51, 63–64. The post-conviction court also found that the trial court "instructed the jury that in assessing a witness's testimony, they could consider any interest, bias or prejudice the witness may have and any relationship the witness may have with another witness or interested party." Appellant's Appendix at 10.

The trial court in fact gave a general instruction on assessing the credibility of witnesses.

■ Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. Counsels' performance is not deficient for failing to seek an instruction that the trial court would and could deny. *See Legue v. State,* 688 N.E.2d 408, 410–11 (Ind.1997). A defendant is not entitled to an instruction that incorrectly applies the law. *See Sherwood,* 702 N.E.2d at 698. We agree with the post-conviction court that the proposed instruction runs counter to the law, and therefore the trial court could properly deny it. "We have repeatedly rejected claims of error for refusal to instruct jurors that they are required to consider the testimony of certain witnesses with great care or caution." *Noojin v. State,* 730 N.E.2d 672, 678 (Ind.2000). *See also Goudy v. State,* 689 N.E.2d 686, 696 (Ind.1997) (upholding trial court's refusal of instruction that "advised the jury to give special scrutiny to the testimony of those who may have reason to be hostile to defendant.");

**21.** This disputed testimony will be discussed in detail *infra.*

*Bieghler v. State,* 690 N.E.2d 188, 201 (Ind. 1997) ("Indiana common law holds it improper to give an instruction concerning the credibility of a particular witness because doing so usurps the jury's function. In effect, Bieghler says his lawyers have been constitutionally ineffective for not asking us to change the rules.").

■ Third, the post-conviction court made certain findings of fact from which it concluded that trial counsels' performance was not deficient for failing to seek an instruction stating that the videotaped demonstration did not depict Lambert's mental state or sobriety at the time of the shooting. The post-conviction court concluded that counsel's performance was not defective because the trial court would not have granted this instruction even if counsel sought it. Appellant's Appendix at 63–64.

The trial court gave a general instruction on how to analyze testimony and evidence:

> You are the exclusive judges of the evidence, the credibility of the witnesses' and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his or her ability and opportunity to observe, the manner and the conduct of the witness while testifying, any interest, bias, or prejudice the witness may have, any relationship with other witnesses or interested parties, and the reasonableness of the testimony of the witness considered in the light of all the evidence in the case.
>
> . . .
>
> *In weighing the testimony to determine what or whom you will believe, you should use your own knowledge, and experience and common sense gained from day to day living . . . .*

(R. at 5799–800) (emphasis added).

■ Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. The post-conviction court concluded that the trial court would not have given this instruction even if trial counsel sought it. We will reverse this conclusion only if the evidence does not support it or the trial court was required to grant the instruction. A trial court is not required to grant an instruction that is covered by other instructions. *See Sherwood,* 702 N.E.2d at 698. The proposed instruction here did precisely what the trial court's general instruction did—limit the jury's use of evidence to its logical purpose and prevent the jury from drawing illogical inferences. It encouraged the jurors to use their "knowledge, experience, and common sense" in examining the evidence, and basic reason would lead them to conclude that the demonstration only showed that it was possible to pull out a gun with arms handcuffed behind the back.[22] Lambert's suggested instruction is covered by this more general instruction. *See Sherwood,* 702 N.E.2d at 698.

■ As a final claim on instructions, Lambert also argues that his counsel were ineffective for failing to oppose one of the trial court's instructions on the presumption of innocence. This instruction read: "In clothing those charged with crime with the presumption of innocence, the law does not contemplate that thereby the guilty should be shielded from merited punishment. Its object is to protect the innocent so far as human agencies can from the effects of unjust verdicts." (R. at 5797.) The post-conviction court concluded that the trial court would not have sustained an objection to this instruction even if trial counsel interposed one. Appellant's Appendix at 64.

The post-conviction court found that, along with the contested instruction, the

---

22. Moreover, counsel's cross-examination elicited the fact that the officers had not consumed alcohol prior to videotaping the demonstration, thereby putting this point in front of the jury.

trial court also "instructed the jury that the presumption of innocence is designed to protect the innocent and to require the State prove guilt beyond a reasonable doubt before conviction, not to shield the guilty from merited punishment." Appellant's Appendix at 10.

At Lambert's trial, the court instructed the jury that

the Defendant is presumed to be innocent until proven guilty beyond a reasonable doubt. And this presumption prevails until the conclusion of the trial, and you should weigh the evidence in light of this presumption of innocence, and it should be your endeavor to reconcile all the evidence with the presumption of innocence if you can.

(R. at 5795–96.)

Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. "In order to establish that counsel's failure to object to a jury instruction was ineffective assistance of counsel, a defendant must first prove that a proper objection would have been sustained." *Potter v. State,* 684 N.E.2d 1127, 1132 (Ind.1997). Moreover, Lambert "must prove that the failure to object was unreasonable and resulted in sufficient prejudice such that there exists a reasonable probability the outcome would have been different" had counsel leveled an objection. *Id.* Lambert argues that his counsel should have objected because he characterizes *Spradlin v. State,* 569 N.E.2d 948 (Ind.1991), as holding that "trial judges *could not* instruct juries in this manner." Appellant's Br. at 66. (emphasis added). However, *Spradlin* recommended that judges refrain from using this type of instruction. 569 N.E.2d at 951 ("Such instruction adds little, if any, elucidation for the jury. We recommend that it not be used in future cases.") (emphasis added). We did not reverse Spradlin's conviction on this ground. *See id. See also Matney v. State,* 681 N.E.2d 1152 (Ind.Ct.App. 1997) ("The *Spradlin* court did not, however, hold that the giving of the instruction constituted reversible error."), *transfer denied.*

The instruction given here was misleading and we reiterate that such instructions should not be used. Indeed, had counsel objected, the trial court should have sustained the objection. However, even if counsel's performance was deficient in this regard, we do not reach a conclusion different from the post-conviction courts as to whether Lambert was deprived of his Sixth Amendment right to counsel. To warrant relief, Lambert must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland v. Washington,* 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

We hold that this instruction does not compel us to vacate Lambert's conviction for two reasons. First, the outcome of the trial was not likely to be different without this instruction, as the evidence of Lambert's guilt was overwhelming. Lambert was alone in the backseat of Officer Winters's car when the officer was shot in the back of the head. He was found with a gun that had been stolen from his employer and tests revealed traces of gunpowder residue on his body. Second, we have held that "to establish both deficient performance and resulting prejudice, a petitioner must show more than isolated poor strategy, bad tactics, a mistake, carelessness or inexperience; *the defense as a whole must be inadequate." Miller v. State,* 702 N.E.2d 1053, 1059 (Ind.1998) (emphasis in original), *cert. denied,* 528 U.S. 1083, 120 S.Ct. 806, 145 L.Ed.2d 679 (2000). *See also Kimmelman v. Morrison,* 477 U.S. 365, 386, 106 S.Ct. 2574, 91 L.Ed.2d 305, (1986) ("[S]ince there are countless ways to provide effective assistance in any given case, unless consideration is given to counsel's *overall* performance, before and at trial, it will be all too easy for a court,

examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.") (emphasis added) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). Counsels' isolated error here did not warrant vacation of Lambert's conviction in the face of the significant overall adversarial testing to which counsel subjected the State's case.[23]

### E

 Lambert argues that trial counsel were ineffective for failing to investigate and present as a mitigating circumstance in the penalty phase evidence that Lambert had certain mental disorders. Lambert identifies these disorders as "organic brain dysfunction, dysthymia, and substance dependence with antisocial and dependent personality features." Appellant's Br. at 26. Lambert argues that these disorders made "it very difficult for Lambert to function effectively both cognitively and behaviorally. The [organic brain dysfunction is] often associated with violent behavior. When his other impairments, depression and dysthymia, are added to acute alcohol intoxication, Lambert was likely to have a difficult time resisting an urge to act on impulse." Appellant's Br. at 40.

The post-conviction court concluded that Lambert's trial counsel made a reasonable strategic decision[24] not to pursue this evidence of mental disorders because it both conflicted with counsels' mitigation strategy and was not credible. Appellant's Appendix at 34, 62. The court concluded that:

> Counsel also competently presented available mitigation evidence—Lambert's intoxication, family evidence, his alleged good character, his unfortunate marriage and his relationship with his son—in an attempt to convince the jury that Lambert had had a difficult life and had murdered the officer at a time of great stress and intoxication but that his life was worth saving, he was capable of rehabilitation, and he was not as dangerous as his crime suggested.

Appellant's Appendix at 64. The post-conviction court also concluded that this mental health evidence was "either inconsistent with, or incredible, in light of mitigation evidence he offered" and "would have risked bolstering the State's theory of the case, would have undermined the reasonable mitigation strategy adopted by trial counsel and would not have resulted in a more lenient sentence." Appellant's Appendix at 34–36.

The post-conviction court made certain findings of fact from which it concluded that trial counsels' performance in this regard was not deficient. To establish the existence of these disorders at the post-conviction stage, Lambert presented the testimony of a neuropsychologist, Dr. Edmund Haskins, and a clinical psychologist, Dr. Robert Smith.[25] The post-conviction

---

**23.** We have upheld convictions in the face of nearly identical instructions. *See Turner v. State*, 682 N.E.2d 491, 497 (Ind.1997). Here, as in *Turner*, "[p]reliminary and final instructions were given that mandated the presumption of innocence. Additionally, instructions explaining that the State had the burden to prove its case beyond a reasonable doubt were given. In context, the presumption of innocence and the prosecutor's burden were explained, in spite of the disapproved instruction." *Id. See also Sevits v. State*, 651 N.E.2d 278, 282 (Ind.Ct.App.1995). ("We conclude that the use of this instruction did not rise to the level of fundamental error. We note further that the record indicates that the jury was given repeated instructions on the State's burden of proof and Sevits' presumption of innocence until proven guilty. Sevits was not unduly prejudiced, and there was no reversible error.") *trans. denied.*

**24.** During the post-conviction hearing, both counsel denied making a strategic decision not to pursue such evidence.

**25.** The court found that Dr. Haskins diagnosed Lambert as suffering from "a deficiency in executive frontal lobe impairment" which caused him to "have problems with impulse control, planning, organization of tasks, solving problems and understanding the consequences of their actions." Appellant's Appendix at 21. The court also found

court found that the testimony of both witnesses was worth little weight in light of counsel's mitigation strategy. The post-conviction court found that the value of Dr. Haskins's testimony was "questionable" because: (1) "The diagnosis conflicts with the reports of two court-appointed psychologists who assessed Lambert's competency to stand trial for the stabbing of another inmate"; (2) "Neither [Haskins or Smith] found Lambert to suffer from any mental impairment"; (3) "Dr. Haskins admitted that his evaluation tested only Lambert's current level of neuropsychological functioning, not his past functioning"; and (4) "Dr. Haskins also testified that people with personality disorders like Lambert's tend to be self-centered, manipulative, unaware of the effects of their behavior on others, and go through cycles of 'acting out'—a portrait that conflicts with the 'good guy' image the defense presented at trial and sentencing." The post-conviction court also gave little weight to Dr. Smith's testimony because (1) "Dr. Smith admitted that the results of the alcohol and substance abuse tests depended upon Lambert's veracity and depended on the setting in which they were administered"; (2) "He admitted that he failed to consult sources of information not provided to him by Lambert's counsel ... sources that showed Lambert was not significantly impaired on the night of the murder"; (3) "Dr. Smith explained that people with antisocial personality disorder have a disregard for society's rules and values and seldom remorse—a portrait that conflicts with the remorseful image Lambert and his counsel sought to present at sentencing." Appellant's Appendix at 25.

There was evidence to support the post-conviction court's findings of fact. Both doctors testified to the various mental disorders that the post-conviction court described. The record contains evidence

that supports the post-conviction court's determination that the doctors' testimony relied in large part on what Lambert and his counsel told them and conflicted with what other mental health professionals had found during the earlier competency evaluation. Moreover, trial counsels' post-conviction testimony established that their penalty phase theory relied on "the intoxication, his history, family history, [but] primarily the intoxication." According to counsel, they attempted to emphasize two things during the penalty phase: "[O]ne of our main thrusts at mitigation [was] again the level of intoxication and the genetic alcohol profile.... The other was to supplement that with some explanation as to Mike's background, what may have led him from where he had been to where he was."

Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. We have held that counsel may make a reasonable tactical decision to "humanize" a capital defendant as an alternate strategy to presenting similar mental health evidence. *See Conner v. State,* 711 N.E.2d 1238, 1251 (Ind.1999), *cert. denied,* —— U.S. ——, 121 S.Ct. 81, 148 L.Ed.2d 43 (2000). In *Conner,* the defendant argued "that trial counsel failed to conduct a reasonable penalty phase investigation, to provide the jury with any meaningful explanation of the crimes, and to present available mitigating evidence of the defendant's childhood traumas, mental disabilities, and intoxication." *Id.* This Court rejected Conner's claim of ineffective assistance of counsel, noting that:

The record indicates that in the penalty and sentencing phases defense counsel's strategy was to *humanize the defendant, an appropriate strategic decision.* Defense counsel presented opening and

that Dr. Haskins diagnosed Lambert as suffering from dysthymia, "a type of chronic, low-level depression." Appellant's Appendix at 21. The court then found that Dr. Smith "retrospectively diagnosed Lambert with dys-

thymia, frontal lobe impairment and antisocial personality disorder" as well as "alcohol and substance addiction." Appellant's Appendix at 24.

closing arguments and testimony from several witnesses in order to present evidence of the defendant's background, including alcohol, drug, and family problems, his relationships, his good qualities, his employment history, and his relatively minor criminal history....

*Id.* (emphasis added). *Cf. Meredith v. State,* 679 N.E.2d 1309, 1312 (Ind.1997) ("Appellant's counsel had no reason ... to raise the issue of mental capacity. In fact, arguing that Appellant lacked the mental capacity to form the requisite intent would have been contrary to Appellant's claim Appellant contended that he did not do the crime, not that he did not intend to do the crime.").

We find the evidence supports the post-conviction court's finding that counsel made a similar strategic decision here. Counsels' penalty phase case portrayed Lambert as an inherently decent person who committed an admittedly horrible crime during the throes of severe intoxication and familial stress. To this end, trial counsel called a number of witnesses, including: (1) Lambert's former employer, who testified that Lambert's crime was "out of his character" and if Lambert was not going to prison he would rehire him despite the fact that Lambert had stolen the murder weapon from the employer's office; (2) Lambert's mother, who testified about Lambert's violent childhood and his close relationship with his then two-year-old son;[26] (3) the son's former foster parent, who testified that Lambert had an especially tender relationship with his son so that the son's "little eyes would light up and he was just real happy" whenever Lambert visited (R. at 5916); (4) an expert in toxicology, who testified that Lambert's alcoholism and level of intoxication clouded his actions on the night of the killing; (5) several ministers and employees from the jails where Lambert was being held, who testified to his amiable demeanor and caring attitude; and (6) a jailer who testified

that Lambert spoke with the teenaged nephew of a police officer to encourage the boy to stay out of trouble.

Precedent supports the post-conviction court's conclusion that it was reasonable for counsel to emphasize Lambert's character and not use or rely on complicated mental health evidence that the post-conviction court found to have "questionable" weight. *See, e.g., Canaan v. State,* 683 N.E.2d 227, 234 (Ind.1997) ("Counsel is permitted to make strategic judgments not to present certain types of mitigating evidence, including evidence of defendant's background."); *Timberlake v. State,* 690 N.E.2d 243, 261 (Ind.1997) ("As a matter of trial strategy, a defense counsel in a capital case may decide what is the best argument to present during the penalty phase."), *cert. denied,* 525 U.S. 1073, 119 S.Ct. 808, 142 L.Ed.2d 668 (1999).

■ Lambert counters the post-conviction court's conclusion by arguing that counsel's tactical choice was not reasonable because it was not supported by sufficient investigation. "[I]n order to make a reasonable tactical decision, counsel must have adequately investigated the client's case because 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *State v. Holmes,* 728 N.E.2d 164, 172 (Ind.2000) (quoting *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052), *petition for cert. filed,* (U.S. Jan. 29, 2001) (No. 00–8381).

Here, as will be discussed, counsel did undertake an investigation of Lambert's mental health. Thus the legal question we are presented with is whether trial counsel's professional judgments with respect thereto supported the extent of the investigation. *Id.*

Trial counsel consulted with a clinical psychologist, Dr. Robert Ten Eyck, who testified at trial.[27] Dr. Ten Eyck adminis-

---

**26.** Trial counsel also introduced a photograph of Lambert's son.

**27.** Dr. Ten Eyck is a clinical psychologist who had practiced for over 20 years at the time of

tered several psychological tests to Lambert. From one of these tests, Dr. Ten Eyck concluded that Lambert "may be somewhat more emotionally excitable perhaps than some other folks. And many people with that indication sometimes behave impulsively under pressure." (R. at 6134.) Both post-conviction experts testified that Lambert's brain condition would result in just such a lack of control over impulses. Even with this information in front of them, trial counsel opted to humanize Lambert and downplay his lack of control. In fact, they actually enlisted Dr. Ten Eyck's testimony to support their mitigation theory: "He still can't see himself as a person who could do that if it hadn't been for the alcohol.... He now feels like maybe he could pay back what happened by helping some other people realize that what can happen when you use alcohol and drugs." (R. at 6153.)

During the post-conviction hearing, Lambert's lead trial counsel testified that Dr. Ten Eyck did not speak with Lambert until jury selection had begun and that this late arrival to the case hampered their ability to develop him as a witness. However, Dr. Ten Eyck's penalty phase testimony spans 42 pages of the record, the second-most of any of Lambert's penalty phase witnesses by a wide margin.[28] During this testimony, Dr. Ten Eyck was able to present several medical conclusions, including that Lambert possesses average intelligence, suffers from depression,[29] and displays immature personality traits. He defined an immature personality as one having a "rather one-sided view or some-

what self-centered view of relationships in general. A tendency to be more easily aroused to feelings of inadequacy or inferiority." (R. at 6144.) Given that trial counsel consulted an expert and made extensive use of that expert's testimony, we find that counsel made sufficient investigation here to warrant reliance on their penalty phase theory.

## IV

■ Lambert argues that his conviction and sentence must be vacated because his appellate counsel were ineffective for failing to raise several issues on direct appeal. His arguments here (some of which mirror his claims of trial counsel ineffectiveness) are that appellate counsel should have challenged on direct appeal (1) whether we had the authority to reweigh his sentence; (2) the presence of uniformed, armed police officers in the courtroom; (3) trial counsel's failure to investigate and assert mental disorders as a mitigating circumstance; (4) the prosecutor's statements during closing arguments; (5) the manner in which the jury was instructed; (6) the admission into evidence of the videotaped demonstration and family photographs, Appellant's Br. at 83; and (7) the reliability of the death sentence.

The post-conviction court made certain findings of fact from which it concluded that trial counsel's performance was not deficient for failing to raise these issues. The post-conviction court found that "[i]n preparing the appeal, counsel not only reviewed the entire record but also sifted

Lambert's trial. He was an associate professor at the Indiana University School of Medicine and was the coordinator of a child inpatient program. He held both a master's and a doctoral degree in clinical psychology, had obtained several fellowships, and was listed in the National Register of Health Service Providers in Psychology.

**28.** Lambert's own sentencing hearing testimony was the defense's most lengthy.

**29.** Dr. Ten Eyck's testimony that Lambert suffered from "reactive depression" (R. at 6143)

shows that trial counsel did in fact present evidence of depression during the penalty phase, albeit by using slightly different scientific language then that used in the post-conviction court. While Dr. Ten Eyck may not have used the technical word "dysthymia," whatever value contained in the post-conviction testimony describing "moderate depression" and sadness was already put into evidence. The same can be said for substance abuse, as the defense's toxicology expert testified that Lambert "fit the profile of a genetic alcoholic." (R. at 6053.)

through the issues to identify the strongest ones.... Counsel focused on the issues that they believed were properly preserved." Appellant's Appendix at 17.

There was evidence to support the post-conviction court's findings of fact. Lambert's appellate counsel described at length their process in choosing what issues to present on appeal. For example, Lambert's lead trial counsel testified that in preparing for appeal, counsel attempted to narrow the issues down to the most likely to succeed: "I think we may be little a less choosy [in a capital case], but certainly there is some of that process in saying ... let's concentrate our efforts and concentrate the court's attention in this area where we feel we may have a better argument, better issue." (R.P–C.R. at 1263.)

■ Our review of the post-conviction court's findings does not lead us to an opposite conclusion than that reached by the post-conviction court. First, Lambert argues that his appellate counsel failed to contest "this Court's appellate sentencing." Appellant's Br. at 83. Because we hold that our reweighing of the aggravating and mitigating circumstances was proper, counsel were not ineffective for failing to contest it. Second, Lambert argues that his appellate counsel should have argued that the trial court's allowing uniformed, armed police officers in the courtroom constituted fundamental error. However, because the trial court would have denied a motion restricting the presence of these officers and it would have been within the discretion of the trial court to do so, appellate counsel had no issue to raise. Third, Lambert argues that his appellate counsel were ineffective for failing to argue that trial counsel should have investigated and presented evidence of mental disorders as a mitigating circumstance. Direct appeal counsel had no duty to argue ineffective assistance of trial counsel. See Woods v. State, 701 N.E.2d 1208, 1220 (Ind.1998), cert. denied, 528 U.S. 861, 120 S.Ct. 150, 145 L.Ed.2d 128 (1999). Fourth and fifth,

Lambert claims that his appellate counsel should have argued that the prosecutor's closing argument was improper and should have raised certain issues related to jury instructions. As discussed, we affirmed the post-conviction court's finding of no ineffective assistance of trial counsel in these respects and for essentially the same reasons affirm its finding of no ineffective assistance of appellate counsel.

■ Lambert next argues that appellate counsel should have taken issue with two exhibits the State admitted. He argues that appellate counsel should have sought a reversal for the admission of the videotaped demonstration of the shooting. However, we held on direct appeal that it was not error for the trial court to admit this demonstration. Lambert v. State, 643 N.E.2d 349, 353 (Ind.1994). Moreover, appellate counsel successfully convinced two justices that the demonstration should not have been admitted into evidence. Id. at 357 (DeBruler, J., concurring in result in part and dissenting in part).

He also argues that appellate counsel should have argued for a reversal based on the trial court's admission of photographs of the victim with family members. As we determined in Part III–B, supra, these pictures were part of the "victim impact evidence" that was discussed on direct appeal.

■ Lastly, Lambert argues that his appellate counsel were ineffective for failing to attack the reliability of the death sentence on direct appeal. Appellant's Supp. Br. at 6. He contends that counsel should have argued that the sentence was unreliable because: (1) counsel failed to investigate and present mitigation evidence in the form of Lambert's mental disorders; (2) the trial court relied on non-statutory aggravating circumstances and failed to consider mitigating circumstances supported by the record; and (3) Lambert was not present during "resentencing." Id.

First, for the same reasons we affirmed the post-conviction court's conclusion that trial counsel were not ineffective for failing to present the mental health evidence Lambert introduced in the post-conviction proceedings, we also affirm the post-conviction court's conclusion that appellate counsel were not ineffective for failing to argue that the sentence was unreliable on this ground.

Second, Lambert argues that his appellate counsel were ineffective for failing to argue that the sentence was unreliable because the trial court considered non-statutory aggravating circumstances and did not consider all the mitigating evidence Lambert presented. Appellant's Supp. Br. at 6. However, our opinion on direct appeal operates as *res judicata* as to Lambert's claims in regards to the aggravating and mitigating circumstances. *See Lambert*, 643 N.E.2d at 355. As we noted in the direct appeal, we initially remanded so that the trial court could consider mitigating evidence of intoxication. The trial court subsequently entered an order that contained what we called a "lengthy and detailed evaluation of each possible aggravator and each possible mitigator." *Id.* We then held that the trial court considered all proper mitigating circumstances and did not consider any non-statutory aggravating circumstances. *Id.*

▮ Third, Lambert argues that his appellate counsel were ineffective because they failed to argue that his sentence was unreliable because he was not given an opportunity to be heard at "resentencing." Appellant's Supp. Br. at 6. It is unclear what Lambert means by resentencing. To the extent this reference is to our appellate reweighing of the aggravating and mitigating factors, we have already analyzed that claim in Part I, *supra*. To the extent Lambert is referring to the revised sentencing order entered after remand, Lambert offers no argument to support such a claim. As such, we have no basis

on which to grant relief. See Ind. Appellate Rule 8.3(A)(7) (West 1999).

V

Lambert argues that his conviction and death sentence must be vacated as a consequence of the State's use of the testimony of Richard Garske, who was incarcerated in the Delaware County Jail at the same time as Lambert. Garske testified that when he discussed the murder with Lambert, Lambert told him: "[I]t was just a cop. Well, it was just a pig is what it was. Not a cop." (R. at 5739.) Lambert summarizes his argument as: (1) the State violated the trial court's discovery order by not disclosing Garske's testimony until trial; (2) the State violated Lambert's constitutional rights by failing to disclose any agreement it had reached with Garske in exchange for his testimony; (3) the State violated Lambert's constitutional rights by failing to disclose evidence of Garske's attempts to obtain substance abuse treatment in lieu of incarceration; (4) trial counsel were ineffective for failing to seek a continuance in order to investigate possible impeachment evidence against Garske; (5) trial and appellate counsel were ineffective for not arguing that Garske's testimony was unreliable; and (6) trial and appellate counsel were ineffective for failing to argue that the trial court judge impermissibly relied on Garske's statement in sentencing.

▮ As to the first argument—that the State violated the discovery order—we have expressed increasing concern over the failure of prosecutors to comply with discovery orders. *See, e.g., Lowrimore v. State*, 728 N.E.2d 860, 867 (Ind.2000), *reh'g denied; Warren v. State*, 725 N.E.2d 828, 832 (Ind.2000); *Goodner v. State*, 714 N.E.2d 638, 642 (Ind.1999); *Williams v. State*, 714 N.E.2d 644 (Ind.1999), *cert. denied*, 528 U.S. 1170, 120 S.Ct. 1195, 145 L.Ed.2d 1099 (2000). But this claim was clearly available on direct appeal; it may not be litigated here.[30] Lambert's related

---

30. Lambert's claim that trial counsel were

ineffective in this regard will be discussed

claim that the "State's failure to list Garske as a witness contravened Lambert's right of confrontation and cross-examination" was also available on direct appeal and is not available here. Appellant's Br. at 46.

██ Second, Lambert argues that the State had a constitutional obligation to disclose any agreement it struck with Garske in exchange for testimony. He argues that the State's failure to do so violated *Brady v. Maryland,* which requires the State to disclose material, exculpatory evidence in its possession. 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The post-conviction court found that "there was no sentence reduction agreement between the State and Garske when Garske testified." Appellant's Appendix at 41. Our review of the record indicates that there was evidence to support the post-conviction court's finding.

To establish the existence of an agreement, Lambert pointed to Garske's release from prison pursuant to a sentence modification signed by the prosecutor just six days after trial. He also cited a sworn affidavit signed by Garske's attorney stating that the prosecutor advised him

> that if Mr. Garske provided testimony at Mr. Lambert's capital trial consistent with the information he provided, the State would be receptive to a second Petition for Modification of Sentence. I had the clear impression that if Mr. Garske provided the testimony desired by the State, his sentence would be reduced, or that he would be released from custody. I advised Mr. Garske of my belief that he would secure sentencing relief in exchange for his testimony. It was my understanding that Mr. Garske shared that belief.... Shortly after Mr. Garske testified for the State

at Mr. Lambert's trial, the [prosecutor] advised me to file a second Petition for Modification.

(R.P–C.R. at 1365–66.) [31] This petition was granted and Garske was released on November 22, 1991. Garske never testified at the post-conviction stage.

The State countered Lambert's argument by pointing to the prosecutor's post-conviction affidavit stating that

> At no time did the undersigned ... in any fashion indicate to anyone the State's intention to condition any action upon Mr. Garske's past or proposed Petition to Modify Sentence upon his actual or anticipated testimony in this cause. To the contrary, both Mr. Garske and his counsel were specifically advised ... that no such promise or inference could or would be made by the State. At no time did the undersigned advise [Garske's attorney or Garske] that the State would be receptive to a petition for modification of the sentence of Mr. Garske in return for any testimony.

(R.P–C.R. at 2094.) The prosecutor similarly testified at a deposition that prior to trial he "admonish[ed Garske that he was not] making any promises, any deals in exchange for his testimony." (R.P–C.R. at 2127.) The State also introduced an affidavit from Garske's attorney that stated

> I do not believe that there was any explicit or confirmed promise by the [prosecutor] to agree to a sentence reduction in exchange for Garske's testimony .... but I felt based on my discussion with [the prosecutor] that the State would agree to a sentence reduction for Garske if he testified as expected by the State.

(R.P–C.R. at 2097.)

The evidence on this point was in conflict and it was up to the post-conviction

*infra.*

31. The prosecutor testified at his deposition that he told Garske's attorney to file this petition only after the attorney "called me up and *generally* wanted to know if there was any-

thing he could do to help Mr. Garske with his sentence...." (R.P–C.R. at 2128.) (emphasis added). The prosecutor then testified that he did not recall speaking with the attorney prior to Garske's testimony.

judge to sort out the credibility of these witnesses. *See State v. McCraney*, 719 N.E.2d 1187, 1191 (Ind.1999) ("Whether a witness' testimony at a postconviction hearing is worthy of credit is a factual determination to be made by the trial judge who has the opportunity to see and hear the witness testify."). "We examine only the probative evidence and reasonable inferences that support the post-conviction court's determination and we neither reweigh the evidence nor judge the credibility of witnesses." *Bivins v. State*, 735 N.E.2d 1116, 1122 (Ind.2000). The post-conviction court evaluated this evidence and determined that "there was no sentence reduction agreement between the State and Garske when Garske testified." Appellant's Appendix at 41. The post-conviction court could reasonably have placed much weight on the disinterested testimony of Garske's attorney, who stated that he had a "clear impression" that Garske would be released if he testified (R.P–C.R. at 1365–66) but understood "that there was [no] explicit or confirmed promise by the [prosecutor] to agree to a sentence reduction in exchange for Garske's testimony." (R.P–C.R. at 2097.)

█ Without an explicit agreement, Garske's unilateral expectation of sentence relief does not warrant reversal on *Brady* grounds. "When a witness hopes for leniency in exchange for his testimony and the State neither confirms nor denies that hope, there is no concrete agreement requiring disclosure. The witness's expectations, coupled with evidence of a deal after the in-court testimony of the witness, are insufficient to require that a disclosure be made." *Rubalcada v. State*, 731 N.E.2d 1015, 1023–24 (Ind.2000). *See also Abbott v. State*, 535 N.E.2d 1169, 1171–72 (Ind. 1989) ("[W]e cannot agree with appellant's conjecture that because Hinman was offered a plea agreement after trial, one existed before trial. We have held that expectations coupled with evidence that a

prosecutor-accomplice/witness deal may have been consummated after the in-court testimony is insufficient to bring the case within the ... rule [of *Newman v. State*, 263 Ind. 569, 334 N.E.2d 684 (1975).]").

█ Third, Lambert argues that the prosecutor should have disclosed possible impeachment evidence in the form of Garske's application for substance abuse treatment in lieu of incarceration. Specifically, a report issued in response to this application stated that Garske's "interview behavior was manipulative, at times, as evidenced by conflicting information regarding his alcohol and drug use history" (R.P–C.R. at 1216) and that he had "difficulty giving accurate answers." (*Id.*) The post-conviction court concluded that "[a]ny evidence of Garske's rejection from a substance abuse treatment program or his general character would not have been admissible as impeachment." Appellant's Appendix at 41.

Evidence Rule 608(b) states that "[f]or the purpose of attacking or supporting the witness's credibility, other than conviction of a crime as provided in Rule 609, *specific instances may not be inquired into or proven by intrinsic evidence.*" (emphasis added). *See generally Pierce v. State*, 640 N.E.2d 730, 732 (Ind.Ct.App.1994) ("The rule [608(b)] prohibits impeachment of a witness by evidence of prior bad acts unless the act is an 'infamous' crime or a crime probative of credibility. The reason for the 'Bad Acts' rule is to prevent the jury from inferring that the witness must be a liar merely because he has done bad things."), *transfer denied.*[32] The application and report describe a prior bad act by showing that Garske had previously lied in order to reduce his sentence. Lambert argues that his trial counsel should have offered this prior bad act to show that because Garske has previously attempted to use deceit to reduce a sentence, he was likely to do so again. Rule 608(b) prohib-

---

32. Section (a) of the same rule allows a general attack on a witness's credibility through opinion or reputation evidence. Ind. Evid. R. 608(a).

its using prior bad acts to attack credibility in this manner, and the post-conviction court was correct to conclude that even had Lambert had this evidence, he could not have introduced it.

■ The fact that such evidence would have been inadmissible under the Rule of Evidence does not necessarily resolve the *Brady* claim. But a *Brady* violation will warrant a reversal "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The evidence from these treatment records only shows that Garske might have shaded some of his statements during the intake interview for the prior offense. We are of the opinion that this minor inroad into Garske's credibility would not have overriden the clear evidence of Lambert's guilt in this case. *See* discussion at Part III–D, *supra.* Moreover, trial counsel had the opportunity to interview Garske prior to his testimony. They used what they learned from this interview to cross-examine Garske on the fact he was currently incarcerated for burglary and had committed other burglaries in the past.

■ Fourth, Lambert argues that his trial counsel were ineffective for failing to seek a continuance when the State offered the Garske testimony at trial. Lambert argues that in light of the fact that Garske's testimony was not disclosed in advance of trial as required by the court's discovery order, counsel should have sought a continuance and investigated Garske. Appellant's Supp. Br. at 4–5. He argues that this investigation would have uncovered impeachment evidence in the form of an agreement with the prosecutor and the records pertaining to Garske's application for substance abuse treatment in lieu of incarceration. *Id.* at 4. It is true that the proper course of action when faced with a discovery violation is to seek a continuance. *See Warren v. State*, 725 N.E.2d 828, 832 (Ind.2000); *Jenkins v. State*, 627 N.E.2d 789, 799 (Ind.1993). However, Lambert suffered no prejudice from his counsel's failure to seek a continuance because there would have been no such impeachment evidence to present to the jury. The post-conviction court found that no agreement existed and we have already held that the records Lambert cites could not have been admitted into evidence.

■ Fifth, Lambert argues that Garske's testimony was "false and misleading" and unreliable and that trial and appellate counsel were ineffective for failing to argue that this testimony was unreliable. Appellant's Br. at 50, Appellant's Supp. Br. at 4–5. However, the post-conviction court specifically found that the testimony was "neither false nor misleading" and found it to be reliable. Appellant's Appendix at 40, 42. Our review of the record indicates that there was evidence to support the post-conviction court's findings of fact. As with the sentence reduction agreement, it was up to the post-conviction judge to make this credibility determination. *See McCraney*, 719 N.E.2d at 1191.

■ Finally, Lambert asserts that trial and appellate counsel were ineffective for failing to argue that the trial court judge impermissibly relied on Garske's testimony when weighing the aggravating and mitigating circumstances. Appellant's Supp. Br. at 5. Lambert cites the judge's reference to Garske's testimony during sentencing to support his claim that he would have received a different sentence had counsel exposed Garske's unreliability at either the trial or sentencing stage. However, we have held that the post-conviction court could determine that Garske was reliable. In any event, we believe that any sentencing error resulting from the judge's use of Garske's testimony was rectified by our reweighing of the aggravating and mitigat-

ing factors in our opinion on rehearing. *See Lambert v. State,* 675 N.E.2d 1060, 1065 (Ind.1996).

## VI

As we mentioned at the outset of this opinion, Lambert phrased much of his argument in terms of trial court error. These claims, some of which have been discussed in other contexts above, relate to: (1) the presence of uniformed, armed police officers in the courtroom; (2) the admissibility of the videotaped demonstration and photographs of the victim; (3) comments by the prosecutor in closing argument; (4) the manner in which the jury was instructed; (5) the presence of mental disorders as a mitigating circumstance in the penalty phase; and (6) the reliability of the death sentence in light of the aggravating and mitigating circumstances. As we previously noted, such freestanding claims of trial court error are unavailable on post-conviction review.

### *Conclusion*

We affirm the post-conviction court's denial of Lambert's petition for post-conviction relief.

SHEPARD, C.J., and DICKSON, BOEHM, and RUCKER, JJ., concur.