**Charles E. ETIENNE, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 40S00–9801–CR–14.

Supreme Court of Indiana.

Sept. 28, 1999.

John T. Roche, North Vernon, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Rosemary Borek, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

BOEHM, Justice.

Charles E. Etienne was convicted of murder and sentenced to sixty years imprisonment. In this direct appeal he contends that (1) the State engaged in prosecutorial misconduct that constitutes fundamental error; (2) the trial court erroneously refused his lesser included offense instruction on reckless homicide; and (3) he received ineffective assistance of counsel. Under most circumstances we will not entertain a claim of ineffectiveness of counsel presented on appeal by the same attorney who tried the case. This case presents no basis for an exception. We affirm the trial court.

**Factual and Procedural Background**

On the evening of April 29, 1996, Etienne and his step-brother Joe Grider were wagering first beer and then money in a pool match against brothers Luke and Shane Brown at the Eagles Lodge in North Vernon. The Browns, both Australians, were staying with James Lonaker, who was also at the club. After several games, name-calling and shoving broke out and the bartender told the Browns to leave. The Browns, Lonaker, Etienne and Grider all exited the club. The men offered different accounts of what occurred outside.

According to Lonaker, Grider grabbed Luke, the two wrestled on the ground and Etienne ran from the scene. Luke soon had Grider in a headlock, and Shane told Luke not to let go of Grider because "he's going to give up in a minute. . . ." Lonaker then saw Etienne running toward the men "with a gun straight out in front of him," heard Shane tell Etienne to put the gun down, and saw Etienne shoot Shane. Lonaker attempted to grab the gun, but Etienne stepped back, fired a shot over Lonaker's head, and said that he would "kill everyone of you mother fuckers." Luke Brown offered a similar account. Luke testified that as he and Grider were wrestling on the ground he heard someone say something about a gun, then heard Grider tell Etienne that there was "no need for that—put it away" and looked up to see Etienne walk "straight up and just shoot Shane." Although Luke did not remember hearing any subsequent shots, he testified that there could have been more.

Grider testified that, while he and Luke were wrestling on the ground, he saw Shane "swing on" or "shove" Etienne. Grider was either rendered unconscious or "had the wind knocked out of [him]" during his altercation with Luke and was unable to recall some of the events but did hear a gunshot.

Finally, Etienne testified that upon leaving the Eagles he saw Luke standing at the edge of the sidewalk. Etienne asked Luke how he was doing and Luke responded that he was waiting for Grider. Etienne told Luke that "fighting wasn't going to settle anything" and then Grider exited the club. Luke walked toward Grider, pushing Etienne to the side. Shane then exited the club and pushed Etienne onto some gravel. Grider and Luke then start-

ed screaming at each other. According to Etienne, he told Shane that he was not going to fight but Shane said "yes you are. We're going to fight." Etienne then turned and ran to his truck, pulled his gun from the console, and returned to the front of the club where Grider and Luke were fighting. Etienne screamed at Shane "[a]t least twice" to get Luke off of Grider. Shane told Etienne that he was going to "kick [Etienne's] fucking ass," and Etienne responded that he had a gun and showed the gun to Shane. Because Etienne believed that Shane was unaffected by his threat, he fired a shot over Shane's head. Etienne continued to scream at Shane to get Luke off of Grider, but Shane did not comply and instead stepped forward toward Etienne. According to Etienne, he backed away from Shane and told Shane "don't make me shoot you," but Shane "kept yelling he was going to kick my ass." Etienne then shot Shane. He agreed in cross-examination that he "pulled the trigger on purpose" and "meant to hit [Shane] with that bullet," but testified that he intended to hit Shane in the shoulder and not the chest. Shane died as the result of a single gunshot wound to the lower part of the heart.

Etienne was charged with murder. The jury was instructed on self-defense, but the trial court refused defense counsel's tendered reckless homicide instruction. The jury convicted Etienne of murder.

### I. Prosecutorial Misconduct

Etienne contends that the State engaged in prosecutorial misconduct. Specifically, he argues that the prosecutor did not comply with a pretrial discovery order and that the prosecutor's closing argument was "fraught with outrageous, inappropriate statements...." We find that none of the alleged errors were preserved for our review.

### A. Noncompliance With Discovery Order

▇ Shortly after the shooting, Etienne gave a statement to police. The statement was recorded on videotape and audiotape. A copy of the videotape and a transcript of the audiotape were provided to Etienne in the normal course of discovery. The videotape played at trial concluded as follows: [1]

OFFICER MCINTOSH: Okay, we'll go ahead and end this interview at 12:41 in the a.m. on 4/30/96.

OFFICER MCINTOSH: I don't understand what you said about how you shot him in the chest.

MR. ETIENNE: Well I tried to shoot him right there when I was shooting him.

OFFICER MCINTOSH: Well.

The transcript, which according to the State was made from the audiotape, did not contain the final exchange, but rather concluded with McIntosh's comment about ending the interview. Although Etienne concedes that he was provided with a copy of the videotape, "albeit of poor quality," he nevertheless asserts error because his final statement from the videotape was not included on the transcript. Moreover, Etienne acknowledges that he was first apprised of this statement, although not its source, during the State's opening statement in which the prosecutor told the jury that Etienne told McIntosh "well I meant to shoot him right here, so he openly admits that he was trying to shoot him." Defense counsel, in his opening statement, responded

I don't know where Mr. Smith [the prosecutor] intends to show that Mr. Etienne shot [Shane] some place other than where he intended to shoot him. That may come out. I thought I was well familiar with the facts of this case, that escaped me, but I'm sure that if that was indeed a statement of that night

---

**1.** The actual videotape was not included in the record of proceedings. Rather, it was played in open court and the court reporter transcribed what was being said.

that he'll show that during his own case in chief.

Etienne did not object to the State's opening statement, allege a violation of the trial court's discovery order [2] or assert a claim of prosecutorial misconduct at any point during the trial. As this Court observed in *Maldonado v. State*, 265 Ind. 492, 498, 355 N.E.2d 843, 848 (1976), a prompt objection to alleged prosecutorial misconduct "affords the trial court an opportunity to prevent or remedy prejudice to a defendant without the considerable waste of time and resources involved in the reversal of a conviction...." Because Etienne did not object to the alleged misconduct, any claim of error is waived. *Mftari v. State*, 537 N.E.2d 469, 473 (Ind.1989).

### B. *Closing Argument*

■ Etienne also points to eight portions of the State's closing argument that he contends were inappropriate and rose to the level of prosecutorial misconduct. Etienne objected to only one of these comments at trial. As to the seven other allegations of prosecutorial misconduct to which no objection was interposed,[3] any claim of error is waived. *Id.*

■ The remaining instance of alleged prosecutorial misconduct involved the following comment by the prosecutor: "now I know self-defense is a significant issue and it ought to be and I value that defense. We talked about it during opening statement. I'm a member of the National Rifle Association and Mr. Vogel [a juror] is maybe some of the others of you are...." Defense counsel objected on the ground that it was not proper to mention groups in closing argument, and the State promptly responded "[f]ine, your honor, I'll strike it." Etienne did not ask for an admonishment or move for a mistrial based on this comment.

■ Not only must a defendant object to alleged misconduct, he or she must also request an appropriate remedy. Generally, the correct procedure is to request an admonishment. *See Brown v. State*, 572 N.E.2d 496, 498 (Ind.1991). However, if counsel is not satisfied with the admonishment or it is obvious that the admonishment will not be sufficient to cure the error, counsel may then move for a mistrial. *See Dresser v. State*, 454 N.E.2d 406, 407–08 (Ind.1983). Etienne's failure to request an admonishment or move for a mistrial results in waiver of the issue. *See Robinson v. State*, 693 N.E.2d 548, 552 (Ind.1998).

### C. *Fundamental Error*

■ To deal with the lack of objections to these matters, Etienne contends that the alleged prosecutorial misconduct

---

2. The proper remedy for a violation of a trial court's discovery order is a continuance, or in extreme circumstances, a mistrial. *See, e.g., Braswell v. State*, 550 N.E.2d 1280, 1283 (Ind. 1990). Etienne requested neither. Moreover, Etienne does not couch his argument on appeal in terms of a mere violation of the discovery order but rather raises his claim as one of prosecutorial misconduct.

3. In his reply brief, Etienne argues that he objected to two of these. First, he contends that he objected to "the compassion speech evoking sympathy," but this objection followed the prosecutor's comments about sentencing: "your Honor I've let this go, compassion speeches talking about the victim's family, supposed to avoid sympathy, now he's talking about sentencing your Honor and I just can't sit here mute." Defense counsel's "objection" specifically observed that he had allowed the compassion speech to continue without objection, but that he was objecting to the comments about sentencing. Similarly, Etienne argues that he objected to the State's "concoction-conspiracy theory" in which the State pointed out that Etienne had had the opportunity to hear all of the State's witnesses and knew what the issues were before testifying at trial. The prosecutor suggested that this may have shaped Etienne's testimony and also suggested that because "[h]e's looking at a murder conviction ... perjury or anything else doesn't make any difference." Etienne did not object until some nine sentences later when the prosecutor had moved on to the subject of intoxication. This is not a timely objection to the quoted comments that dealt with a different subject.

constitutes fundamental error. To rise to the level of fundamental error, the error "must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process." *Wilson v. State*, 514 N.E.2d 282, 284 (Ind.1987); *see also Barany v. State*, 658 N.E.2d 60, 64 (Ind.1995) (defining fundamental error as error "so prejudicial to the rights of the defendant as to make a fair trial impossible"). As to the alleged discovery violation, we fail to see how Etienne was prejudiced because his other accounts to the police and his testimony at trial were to the effect that he intentionally shot Shane, albeit in self-defense. Moreover, most of the State's allegedly improper comments during closing argument were fair characterizations of the State's view of the evidence [4] and were only a small part of a lengthy closing argument at the end of a five-day trial. There was no fundamental error here. *Cf. Robinson*, 693 N.E.2d at 552 (rejecting a claim of fundamental error involving a closing argument in which the defendant claimed "that the prosecutor disparaged him or his counsel in front of the jury, or suggested that the defense was trying to mislead the jury").

## II. Refusal of Reckless Homicide Instruction

Etienne tendered a lesser included offense instruction for reckless homicide but the trial court refused to give it, citing *Wright v. State*, 658 N.E.2d 563 (Ind.1995), after making detailed findings. *Wright* sets forth a three part test to be applied when trial courts are asked to instruct the jury on a lesser included offense. Parts one and two require the trial court to determine whether the lesser included offense is either factually or inherently included in the greater offense. If so, part three of *Wright* requires the trial court to determine if there is a "serious evidentiary dispute" as to any element that distinguishes the greater offense from the lesser. *Id.* at 567.

It is well settled that reckless homicide is an inherently included lesser offense of murder. *See McEwen v. State*, 695 N.E.2d 79, 85 (Ind.1998) (citing *Wright*, 658 N.E.2d at 567). The only element distinguishing the two offenses is the defendant's state of mind: reckless homicide occurs when the defendant "recklessly" kills another human being and murder occurs when the killing is done "knowingly" or "intentionally." *Compare* IND. CODE § 35–42–1–5 (1998) *with id.* § 35–42–1–1(1). Reckless conduct is action taken in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from the acceptable standards of conduct. *Id.* § 35–41–2–2(c). In contrast, a person engages in conduct "knowingly" if the person is aware of a "high probability" that he or she is doing so. *Id.* § 35–41–2–2(b). The trial court refused Etienne's tendered instruction because it found no serious evidentiary dispute as to the mental element of the offense. Because the trial court specifically made a finding of no evidentiary dispute,[5] we review its rejection of the tendered instruction for an abuse of dis-

---

4. The notable exception is the prosecutor's comment that "[i]f people like Mr. Etienne are allowed to use excessive force and get by with it, those are the cases that they use against us to take guns away from law abiding people because he killed somebody for no reason...." Although we agree with Etienne that this comment improperly urged the jury to convict to prevent law-abiding citizens from having their guns taken away, it is not so egregious as to constitute fundamental error.

5. The trial court observed that
   1. Defendant asserted and claimed self-defense throughout trial[.]
   2. Defendant shot the victim from very close range with a 380 automatic handgun.
   3. Defendant, by his own admission, shot the victim in the left chest area wherein lies the heart[.]
   4. Defendant went and retrieved the handgun from his vehicle and returned to the victim with ample time to weigh the gravity of what he was about to do.

cretion. *Brown v. State*, 703 N.E.2d 1010, 1019 (Ind.1998) (citing *Champlain v. State*, 681 N.E.2d 696, 700 (Ind.1997)).

The only evidence of reckless conduct that Etienne points to is his pre-shooting conduct of taking a loaded handgun into the volatile situation and his narrowing of the gap between himself and Shane to five or six feet. However, this was not the issue to be decided by the jury. The jury was to determine whether Etienne "knowingly" killed Shane which, according to the statutory definition quoted in the jury instructions, turned on whether Etienne was "aware of a high probability" that his conduct might kill Shane. When one aims a gun at another person's shoulder or upper chest area and fires it, he or she is reasonably aware of a high probability that the shot may kill. Accordingly, the trial court did not abuse its discretion in refusing Etienne's reckless homicide instruction. *See Sanders v. State*, 704 N.E.2d 119, 122–23 (Ind.1999) (upholding the rejection of reckless homicide instruction because the defendant, who also claimed self-defense, testified that he aimed and shot at the victim and accordingly "must have known that firing directly at a person at such close range is highly probable to result in death").

### III. Ineffective Assistance of Counsel Claim

As a final point Etienne contends that his trial counsel was ineffective. We note that Etienne's trial counsel is also his appellate counsel. Arguing one's own ineffectiveness is not permissible under the Rules of Professional Conduct. *See Matter of Sexson*, 666 N.E.2d 402, 403–404 (Ind.1996); Ind. Professional Conduct Rule 1.7(b). The State does not argue here, as it did in *Cook v. State*, 675 N.E.2d 687 (Ind.1996), that Etienne's ineffectiveness claim is unavailable on direct appeal because his trial counsel and appellate counsel are the same. Indeed, we rejected that argument in *Cook* and addressed the merits of the defendant's claim. *Id.* at 691–92.

However, *Cook* was decided before *Woods v. State*, 701 N.E.2d 1208 (Ind.1998), *petition for cert. filed*, —— U.S.L.W. —— (U.S. June 14, 1999) (No. 98–9935), which held that an ineffective assistance of trial counsel claim will be foreclosed in postconviction proceedings if it is raised on direct appeal. *Id.* at 1210. We believe that *Woods* requires a different response to the *Cook* situation. Because trial counsel are poorly positioned to critique their own performance or to proclaim it deficient, a defendant should not be foreclosed from ever having a fresh set of eyes consider and argue the effectiveness of his or her trial counsel.

Accordingly, under most circumstances we will not entertain a claim of ineffectiveness of counsel presented on appeal by the same attorney who tried the case. There may be circumstances in which an ineffectiveness claim is sufficiently clear that immediate review is appropriate to avoid unnecessary delay in addressing it. Here, however, Etienne's ineffectiveness claim is little more than a rehashing of his other claims and presents no basis for an exception.

### Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.