**Chawknee CARUTHERS, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 46A05–0810–CR–623.

Court of Appeals of Indiana.

July 15, 2009.

Transfer Granted Oct. 1, 2009.

James Cupp Michigan City, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Monika Prekopa Talbot, Deputy

Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

VAIDIK, Judge.

### Case Summary

Chawknee Caruthers was convicted of murder and found to be a habitual offender. In this direct appeal, he contends that his trial counsel was ineffective. He also contends that the trial court abused its discretion by failing to *sua sponte* conduct an interrogation of the jury after defense counsel brought to the court's attention during trial that some of the jurors felt intimidated by actions attributed to the defendant, the defendant's family, and the victim's family. He also contends that the evidence is insufficient to support his conviction because the testimony of two witnesses is incredibly dubious. We reverse Caruthers' conviction because we conclude that the trial court abused its discretion by failing to investigate the content, extent, and possible prejudicial impact of the threats against the jury. However, because we also conclude that the incredible dubiosity rule does not apply and there is sufficient evidence to support his conviction, the State is free to retry him.

### Facts and Procedural History

On September 15, 2007, Caruthers was visiting with a friend, Krista Anderson, at her LaPorte County home. While the pair was smoking marijuana, Santana Miller and a few other individuals entered the home. Miller was searching for some guns that he believed belonged to him as payment for cocaine he had given to Anderson for her to sell. When Caruthers lifted his shirt to show Miller that he did not have the guns on him, Miller punched him in the mouth and started choking him. Anderson told Miller that he and the other individuals needed to leave, and they did.

Caruthers then called another friend, Richard Smith, who came and picked up Caruthers. Caruthers called Anderson to ask where Miller lived, and she told him that Miller lived on Pleasant Street and described his residence. Caruthers and Richard then drove to the home of Richard's brother, Corey Smith. At the home, Richard was showing Caruthers a nine millimeter Ruger that belonged to Corey. Corey walked away from the room, and a short time later, Richard also walked away, leaving Caruthers alone with the handgun. When Richard returned, the gun was no longer on the table, and Richard assumed that Corey had put it away.

Richard, Corey, and Caruthers then left in a green Escort. Richard drove, Caruthers rode in the front passenger seat, and Corey sat in the back. Eventually, the trio traveled to Pleasant Street at Caruthers' request. The trio circled the block a few times, until Caruthers spotted a man who was standing with a group of people in front of a home examining a lawnmower on a truck trailer and said, "That looked like the guy." Tr. p. 523. Ultimately, Caruthers directed Richard to drive into an alley. From the alley, Caruthers spotted the man they had been following.

Caruthers eased out of the passenger side window, sat on the window ledge of the Escort, and pulled a handgun from his pants. Richard and Corey heard several gunshots. Caruthers then came back into the car and told Richard to drive. The group returned to Corey's home, and Caruthers said, "Man, I think I got him." *Id.* at 533. Corey asked his wife to put the gun away, and after Richard told his girlfriend that Caruthers had shot someone, Richard's girlfriend advised Corey's wife to wipe the gun to remove fingerprints.

However, Caruthers did not shoot Miller. Miller was not present at the scene. Instead, one of the rounds Caruthers fired

struck the chest of Karim Turner, who was wearing a shirt similar to one that Miller had been wearing, and Turner fell to the ground. The individuals who had been standing with Turner—Jessica Stalling, Fahim Pasha, Kersee Anderson (no relation to Krista Anderson), and Tom Buford—had seen a green Escort circling the block, drive into the nearby alley, and stop. These individuals saw that the passenger riding in front was wearing a dark hoodie and heard gunshots coming from the vehicle. Stalling saw flames coming from the passenger's gun as it was fired. One of the bystanders called 911 when she saw Turner lying on the ground. Turner died soon after as a result of the gunshot wound to his chest.

Meanwhile, Corey told Caruthers to leave his home, so Richard and his girlfriend gave Caruthers a ride in the green Escort. En route, a Michigan City police officer stopped the car for a license plate violation. The officer noticed that Caruthers was wearing a dark hoodie. Pasha, who had traveled to the police station to give a statement, was walking back from the police station and observed that the police had pulled over a green Escort. Pasha ran up to the officer to identify the car as the one involved in the shooting. When Pasha saw Richard and his girlfriend in the car, Pasha became unsure about whether it was the same car. Pasha did not see the third individual's face. Because the officer found marijuana residue, all three vehicle occupants were patted down and the vehicle was searched, but no weapons were found inside the car. The officer then released the group.

Caruthers returned to Anderson's home, and he confessed to her that he had shot Turner by mistake, thinking that he was Miller because Turner and Miller had been wearing similar shirts. *Id.* at 147–48. He also confessed to Anderson's mother. *Id.* at 587–88. After reading an article in the newspaper about the shooting, Corey gave the gun to another person, who then gave the gun to the police. It was later determined that the shell casings found in the alley were fired from Corey's gun.

The State charged both Richard and Caruthers with murder.[1] The State later dismissed the charges against Richard but filed a habitual offender allegation[2] against Caruthers. Caruthers' jury trial began on July 28, 2008. In the middle of the State's case-in-chief during a break between two witnesses, Caruthers' counsel informed the trial court that it had come to his attention that at least one of the jurors was feeling intimidated by actions they attributed to Caruthers. Counsel stated that he thought this was a very serious allegation. Without a request to question the jurors, the trial court continued with the State's testimony. At the conclusion of his bifurcated trial, the jury found Caruthers guilty of murder and found him to be a habitual offender. At the beginning of the sentencing hearing, the trial court stated that during trial the defense had raised an issue "concerning what was loosely referred to as jury tampering." Sent. Tr. p. 1. The trial court stated that members of the jury had expressed concerns about their security to the bailiff on more than one occasion as a result of actions taken by the victim's family, Caruthers' family, and Caruthers himself. In response to these concerns, the trial court ordered extra security and alternate parking for the jurors. The court said that it had informed the jurors that these additional security precautions had been taken and that at no point afterward had a juror

---

1. Ind.Code § 35–42–1–1.

2. Ind.Code § 35–50–2–8.

expressed that they had been approached or threatened. The trial court sentenced Caruthers to sixty-five years for murder with an additional thirty years for the habitual offender enhancement. Caruthers now appeals.

### Discussion and Decision

In this direct appeal, Caruthers raises several issues. Caruthers contends that his trial counsel[3] was ineffective for waiving his request for a speedy trial without his consent, for failing to request an interrogation of the jury after an allegation of jury tampering, and for failing to actively participate in the habitual offender proceedings. Caruthers also contends that the trial court erred by failing to interrogate the jury *sua sponte* after the allegation of jury tampering was raised. Finally, Caruthers argues that the evidence was insufficient to support his conviction for murder because the testimony of two eyewitnesses was incredibly dubious.

One issue raised by Caruthers is dispositive: whether the trial court erred by failing to interrogate the jury after learning that one or more jurors felt intimidated by actions they attributed to multiple parties connected with the trial.

### I. Threats Against the Jury

During the State's case-in-chief, during a break between witnesses, Caruthers' counsel made the following statement:

There apparently is some information afloat which I would characterize as somewhat a thinly veiled allegation of jury tampering, and that concerns me greatly. Apparently, someone somewhere has received information from a juror or jurors that one or more of them, the jurors, are feeling intimidated by actions that such juror or jurors attribute to my client. I wanted to make a record on that, Your Honor, because I think it's a very serious allegation and I just—I am thankful that the Court has given me an opportunity to do so.

Tr. p. 499–500. Defense counsel did not ask the court to interrogate the jury regarding the possible threats or otherwise provide a factual basis for the allegation and did not ask for a mistrial. Nor did the trial court take any action *sua sponte* at that time to address the issue. The topic did not arise again until sentencing, when the trial court stated the following:

Before we proceed to sentencing, I want to make a record on something. During the trial, an issue was raised by the defense that there was information concerning what was loosely referred to as jury tampering. Members of the jury did express security concerns on more than one occasion to the bailiff as a result of various family members of the victim, of the defendant, as well as the defendant himself. In response, the Court arranged for extra security and alternate parking in front of exit and entrance for the jurors. To allay the jurors [sic] concerns, the Court did personally inform the jurors of the addition-

---

**3.** It appears from the CCS that Caruthers was represented by a series of several attorneys before this appeal. *See* Appellant's App. p. 2 ("9/26/07 MINUTE ENTRY Pamela S. Krause files entry of appearance as public defender on behalf of deft, enters preliminary plea of not guilty and requests discovery."); 6 ("7/28/08 DEFENDANT AND ATTORNEY APPEAR Deft in court in person and w/ counsel, J. Cupp.").

Although it is not clear which attorney waived the request for a speedy trial, James Cupp, Caruthers' attorney on appeal, represented him during both the guilt phase and the habitual offender phase of trial and is now arguing that his trial representation was ineffective. Our Supreme Court has stated that arguing one's own ineffectiveness is not permissible under the Rules of Professional Conduct. *Etienne v. State,* 716 N.E.2d 457, 463 (Ind.1999).

al security precautions that were in place and instructed them on the ministerial aspects of the precautions. At no time did any juror express to the Court that they had been personally approached or threatened after the security precautions were put in place and the concerns regarding personal safety were expressed to the bailiff or made known to the Court.

Sent. Tr. p. 1.

Caruthers failed to either ask the trial court to interrogate the jury or otherwise object to the ameliorative actions taken by the trial court to allay the jury's concerns about security. Nevertheless, Caruthers argues that the trial court's failure to *sua sponte* initiate an investigation into the possible threats constituted fundamental error that violated his right to an impartial jury. "The fundamental error doctrine is an exception to the general rule that the failure to object at trial constitutes a procedural default precluding consideration of an issue on appeal." *Jewell v. State*, 887 N.E.2d 939, 940 n. 1 (Ind. 2008). The fundamental error exception is extremely narrow. *McQueen v. State*, 862 N.E.2d 1237, 1241 (Ind.Ct.App.2007). To qualify as fundamental error, the error must be "so prejudicial to the rights of the defendant as to make a fair trial impossible." *Carden v. State*, 873 N.E.2d 160, 164 (Ind.Ct.App.2007). The fundamental error exception "applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Hayworth v. State*, 904 N.E.2d 684, 694 (Ind.Ct.App.2009) (quoting *McQueen*, 862 N.E.2d at 1241).

The right to trial before an impartial fact-finder is the cornerstone of our justice system. Article 1, § 13 of the Indiana Constitution guarantees criminal defendants the right to trial by an impartial jury. This right is an essential element of due process. *Black v. State*, 829 N.E.2d 607, 610 (Ind.Ct.App.2005), *trans. denied.* "It is of course fundamental to our system of jurisprudence and guaranteed by our federal and state constitutions that an accused in a criminal case is entitled to a trial by jury. This necessarily contemplates a fair and impartial trial before a panel of competent jurors." *Hatfield v. State*, 243 Ind. 279, 183 N.E.2d 198, 199 (1962).

A juror can potentially become biased or prejudiced as a result of threats or intimidation. A biased juror must be dismissed. *Joyner v. State*, 736 N.E.2d 232, 239 (Ind.2000), *reh'g denied.* To address the possibility that a juror has been exposed to extrajudicial comments, including threats, our Supreme Court adopted the *Lindsey* procedure[4] in *Daniels v. State*, 264 Ind. 490, 346 N.E.2d 566 (1976). *See Joyner*, 736 N.E.2d at 239. In *Daniels*, the mother of the victim made threatening comments to the wife of one of the jurors at some point during the trial proceedings. Upon learning of the threat made to the juror's wife, the trial court interrogated each juror to determine whether anyone had heard anything about the trial or discussed the trial with anyone else, and each juror answered that he had not. The juror's wife testified regarding the threat, but it was not clear from her testimony how much she had told her husband about it. The Supreme Court decided that the *Lindsey* procedure was applicable under these facts and quoted the procedure:

---

**4.** The *Lindsey* procedure, so-called because it was first expressed in *Lindsey v. State*, 260 Ind. 351, 295 N.E.2d 819 (1973), was initially prescribed for addressing a suggestion that the jury has been improperly exposed to prejudicial publicity.

Upon a suggestion of improper and prejudicial publicity, the trial court should make a determination as to the likelihood of resulting prejudice, both upon the basis of the content of the publication and the likelihood of its having come to the attention of any juror. If the risk of prejudice appears substantial, as opposed to imaginary or remote only, the court should interrogate the jury collectively to determine who, if any, has been exposed. If there has been no exposure, the court should instruct upon the hazards of such exposure and the necessity for avoiding exposure to out-of-court comment concerning the case. If any of the jurors have been exposed, he must be individually interrogated by the court outside the presence of the other jurors, to determine the degree of exposure and the likely effect thereof. After each juror is so interrogated, he should be individually admonished. After all exposed jurors have been interrogated and admonished, the jury should be assembled and collectively admonished, as in the case of a finding of 'no exposure.' If the imperiled party deems such action insufficient to remove the peril, he should move for a mistrial. Obviously, if at any stage the court believes the peril to be substantial and uncurable, it should declare a mistrial sua sponte. At all stages, the trial court must have discretion to make the determination, within the context of the particular circumstances; and a denial of a motion to interrogate the jury will be reversible error, only if we can say that there has been substantial peril. If the jury has been interrogated and admonished, as set forth above, the continuance of the trial, over the imperiled party's motion for a mistrial, will be reversible error only if it can be said, after giving the decision of the trial judge the bene-

fit of all reasonable doubt, that the peril was such as to be uncurable by instruction.

*Daniels,* 346 N.E.2d at 568–69 (quoting *Lindsey,* 295 N.E.2d at 823). Although the Court stated that it would have been preferable for the trial court to investigate more deeply into the extent of the husband-juror's knowledge of the threat and admonish him not to discuss the matter with the other jurors, the Court held that the trial court did not abuse its discretion because the trial court had determined that none of the jurors "had suffered prejudicial exposure to extraneous influences that would warrant removing the cause from the jury." *Id.* at 569.

Since *Daniels,* our courts have addressed several cases involving threats against the jury. The Indiana Supreme Court concluded in *McDaniel v. State,* 268 Ind. 380, 375 N.E.2d 228 (1978), that the trial court did not abuse its discretion by denying the defendant's motion for a mistrial after it was revealed that one of the jurors received a threatening phone call about the case because the trial court individually interrogated the sole affected juror, discharged him, impaneled an alternate, and admonished the jury not to discuss the case with anyone and to report any attempts made to discuss the case with them. That same year, the Court held in *Owen v. State,* 269 Ind. 513, 381 N.E.2d 1235 (1978), that the trial court did not abuse its discretion by denying the defendant's motion for a mistrial after a juror received a threatening phone call during trial because the trial court talked to the juror and ruled, based on her statements, that she could still be impartial. Nor was it established that the juror had informed anyone else about the threat she received. In a more recent case, *Joyner,* the Supreme Court found that the trial court did not abuse its discretion in refus-

ing the defendant's request that the trial court excuse a juror who had been threatened by two of her co-workers, who were acquaintances of the defendant, and grant a mistrial. After the juror reported the threat, she assured the trial court that the threat did not affect her ability to serve on the jury and that she remained impartial to both sides. The juror also commented that others on the panel might have been approached as well. The trial court questioned each juror, who assured the trial court that he or she had not discussed the case with anyone. The Supreme Court concluded, based on the facts of the case, that there was no evidence of actual or implied bias and decided that the trial court properly refused to declare a mistrial. *Joyner,* 736 N.E.2d at 238–39.

■ In *McDaniel, Owen,* and *Joyner,* the trial court questioned the jurors as to possible bias after the defendant moved for a polling of the jury, a mistrial, or both. Here, the trial court did not conduct an investigation because the defense failed to request either interrogation of the jurors or a mistrial. Nonetheless, the trial court has an obligation to ensure that a defendant's right to an impartial jury is not violated. *See Daniels,* 346 N.E.2d at 569 ("Obviously, if at any stage the court believes the peril to be substantial and uncurable, it should declare a mistrial sua sponte."). Our Supreme Court described the contours of this obligation in *Lindsey.* There, the defendant moved for a mistrial without asking to have the jury polled to determine which jurors, if any, had been exposed to a newspaper story about the case. The Court stated that the request for a mistrial and the colloquy that followed brought the problems to the attention of the trial judge and then described the judge's resulting obligation:

The threat of prejudice being substantial, the prime consideration of the trial judge should have been to protect the integrity of the trial and not to salvage it. That obligation may be satisfied only by taking the best reasonably available steps to assure a verdict free of improper influences and not by proceeding upon the assumption that all may be well and that, if not, it will be detected and rectified later.

*Lindsey,* 295 N.E.2d at 824. Although the defendant in *Lindsey* did not ask to have the jury polled to determine which jurors had been exposed to the prejudicial publication, the Court concluded that the defendant was entitled to have the jury polled and that the trial court abused its discretion by failing to take reasonably available steps to ensure that the verdict was free from improper influences.

Likewise here, the trial court did not take reasonably available steps to investigate an allegation of threats which the trial court found credible enough to prompt extra security measures. The jurors themselves expressed that they felt intimidated, demonstrating that some of them had been exposed to possible threats. Upon learning of the possibility that some of the jurors felt intimidated by actions they attributed to Caruthers, Caruthers' family, or Turner's family, the trial court did not interrogate the jury either to determine the content of the possible threatening actions or statements or to determine how many of the jurors felt intimidated. Nor did the trial court query whether the affected jurors believed they could remain impartial or ask whether any out-of-court statements were made to them about the case.

■ Because no substantive record was made on this issue, we do not know either what occurred to cause at least some of the jurors to feel threatened or

how prejudicial these occurrences might have been.[5] But we do know that the trial court did not view the threats as imaginary or remote; indeed, the trial court recognized at sentencing that members of the jury had expressed security concerns on more than one occasion based on fears they had about the victim's family, Caruthers' family, and Caruthers himself and that it had taken action by ordering extra security and alternate parking arrangements. Although it was commendable for the trial court to take action to protect the jury's safety, the trial court's actions, without further investigation into the possible threats, could have led the jurors, including any jurors not directly exposed to threats, to believe that the judge believed that they were in danger and that they were, in fact, genuinely in danger. Nonetheless, the trial court did not address any prejudicial effects this might have had on Caruthers' right to an impartial jury. We recognize that the trial court is in the best position to assess a jury's impartiality, *Spears v. State*, 811 N.E.2d 485, 490 (Ind. Ct.App.2004), but here the trial court did not investigate the extent or nature of the threats or the jury's impartiality once it became apparent to the trial court that the jury felt intimidated. Under these circumstances, we conclude that the trial court abused its discretion by failing to investigate and this failure constituted fundamental error.

Now we must determine the remedy for this error. The State concedes that "[e]fforts by spectators at trial to intimidate judge, jury, or witnesses violate the most elementary principles of a fair trial." Appellee's Br. p. 14 (citing *Lambert v. State*, 743 N.E.2d 719, 733 (Ind. 2001)). However, the State, urging us to conclude that the error is harmless rather than fundamental, argues that "based on the evidence, the jury would have found Defendant guilty with or without any threat against the jurors." *Id.* at 16. But "some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error. The right to an impartial adjudicator, be it judge or jury, is such a right." *Riggs v. State*, 809 N.E.2d 322, 328–29 (Ind.2004) (quoting *Gray v. Mississippi*, 481 U.S. 648, 668, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987)). As discussed further below, there was abundant evidence produced at trial to support Caruthers' conviction for murder. But we conclude that the failure to ensure during trial[6] that the defendant was tried by an impartial jury after some of the jurors reported feeling intimidated constituted fundamental error that warrants a new trial. This is particularly so when the court institutes protective measures, measures known by the jurors that may substantiate their fears. *See Lindsey*, 295 N.E.2d at 824 (reversing for new trial because "the accused was unconstitutionally subjected to a grave peril to which he should not have been subjected" as a result of trial court's failure to interrogate

---

5. Although in this case the jury reported feeling threatened by both the victim's family and the defendant and his family, it would not necessarily affect our result if the jury perceived that it was being threatened only by the defendant's side. Although a defendant making threats should not profit by his own wrongdoing, we can imagine, for example, a scenario wherein a jury mistakenly believes it is being threatened by a defendant or a defendant's family. Such a situation could be highly prejudicial.

6. "The *Lindsey* procedures are not appropriate and are not available for attacking a verdict." *Fox v. State*, 457 N.E.2d 1088, 1092 (Ind.1984). The trial court cannot wait until after the verdict to investigate whether the jury was affected but instead should take prompt action to address the issue during trial. *See Lindsey*, 295 N.E.2d at 823.

the jury to determine the extent of its exposure to prejudicial publicity); *Stroud v. State,* 787 N.E.2d 430, 436 (Ind.Ct.App. 2003) (reversing for new trial because the trial court abused its discretion by failing to properly follow the *Lindsey* procedure after learning that a portion of the jury was exposed to potentially prejudicial media coverage), *trans. denied.*

■■ We recognize that jurors need not be absolutely insulated from all extraneous influences regarding a case. *Lindsey,* 295 N.E.2d at 822–23. Nor do we intend to suggest that trial counsel can expect to achieve delay or tactical advantage by presenting mere speculation that a jury has been exposed to extraneous influences. *See id.* Trial courts have discretion to deal with this type of problem. But in this case, where the trial court instituted protective measures known to the jury as a result of juror reports of being threatened, the trial court abused its discretion by not inquiring as to the impact of those threats on the jury's impartiality.

## II. Double Jeopardy

■ Because we conclude that Caruthers' conviction for murder with a habitual offender enhancement must be reversed, we must determine whether double jeopardy protections bar retrial. Double jeopardy precludes retrial when there is insufficient evidence to support the conviction. *Robinette v. State,* 741 N.E.2d 1162, 1167 (Ind.2001); *Specht v. State,* 838 N.E.2d 1081, 1094 (Ind.Ct.App.2005), *trans. denied.* Thus, we now address the sufficiency of the evidence supporting Caruthers' conviction in the event the State seeks to retry him.

■■ When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v.*

*State,* 867 N.E.2d 144, 146 (Ind.2007). It is the factfinder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider only the evidence most favorable to the trial court's ruling. *Id.* Appellate courts affirm the conviction unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Id.* The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.* at 147.

■ In order to convict Caruthers of murder, the State had to prove that he "knowingly or intentionally kill[ed]" Turner. I.C. § 35–42–1–1(1). As enumerated in the facts above, there is ample evidence from which a jury could find that Caruthers knowingly or intentionally killed Turner, even though he was under the mistaken impression that it was Miller he was shooting. Caruthers, soon after Miller had hit and choked him, asked Anderson where Miller lived and then directed his friends, Richard and Corey, to take him to that street in the green Escort. Caruthers, who was wearing a black hoodie, took Corey's handgun with him on the trip to Pleasant Street and rode in the front passenger seat. Corey testified that he saw Caruthers pull the weapon and heard the resulting shots from the car. Richard testified that he saw Caruthers ease out of the car window and face the group of people on the lawn, heard the shots ring out, and then saw Caruthers holding the gun. Members of the group on the lawn with Turner described the shooter as a man in a black or dark hoodie sitting in the front passenger seat of a green Escort. Caruthers later confessed to Anderson and

her mother that he was responsible for the shooting.

Nevertheless, Caruthers argues that the evidence is insufficient to support his conviction for murder because Richard's and Corey's testimony is inherently improbable. The "incredible dubiosity rule" provides that a court may "impinge on the jury's responsibility to judge the credibility of witnesses only when confronted with inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity." *Murray v. State*, 761 N.E.2d 406, 408 (Ind.2002). The application of this rule is limited to where a sole witness presents inherently contradictory testimony that is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the defendant's guilt. *James v. State*, 755 N.E.2d 226, 231 (Ind.Ct.App.2001), *trans. denied.* "[A]pplication of this rule is rare and ... the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no person could believe it." *Stephenson v. State*, 742 N.E.2d 463, 497 (Ind.2001) (citation omitted).

Caruthers uses the incredible dubiosity rule to challenge the testimony of two witnesses, Richard and Corey Smith. As for Corey's testimony, Caruthers argues that the testimony regarding Caruthers being the shooter is inherently improbable because Corey admitted at trial that he was very intoxicated at the time of the shooting. As for Richard's testimony, Caruthers argues that the testimony regarding Caruthers is inherently improbable because Richard was originally suspected of shooting Turner. Because there is more than one witness to the shooting, the incredible dubiosity rule does not apply to this conviction, nor is there a complete lack of circumstantial evidence of Caruth-

ers' guilt. Further, Caruthers' argument is really a request for us to reweigh the evidence and assess Corey's and Richard's credibility, which we cannot do. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind.2005).

In conclusion, there is sufficient evidence from which a jury could find that Caruthers knowingly or intentionally killed Turner. As such, the State is not barred by double jeopardy protections from retrying Caruthers. *See Specht*, 838 N.E.2d at 1095. As a final note, on retrial, the State can also reprosecute the habitual offender enhancement, *see Jaramillo v. State*, 823 N.E.2d 1187, 1191 (Ind.2005), and Caruthers makes no argument regarding the sufficiency of the evidence supporting the enhancement.

Reversed.

NAJAM, J., concurs.

FRIEDLANDER, J., dissents with separate opinion.

FRIEDLANDER, Judge, dissenting.

I disagree with the Majority's conclusion that this conviction must be reversed because the trial court failed sua sponte to investigate the claim of juror intimidation, and therefore respectfully dissent.

Everyone, including the Majority, Caruthers, the State, and this writer, agree that the trial court *should* have investigated further the allegation of jury intimidation. I feel compelled to observe at the outset that Caruthers presents the issue in two forms—first as ineffective assistance of trial counsel (for failing to request that the trial court pursue the matter), and second as a claim of trial court error in failing to pursue the matter on its own initiative. The Majority addresses the issue only in the latter context, and correctly so. It appears that Caruthers' appellate counsel was also his trial counsel. Thus, in

presenting the former claim, counsel is arguing his own ineffectiveness at trial. "Arguing one's own ineffectiveness is not permissible under the Rules of Professional Conduct." *Etienne v. State*, 716 N.E.2d 457, 463 (Ind.1999). For this reason, "under most circumstances we will not entertain a claim of ineffectiveness of counsel presented on appeal by the same attorney who tried the case." *Id. See also Timberlake v. State*, 753 N.E.2d 591, 612 n. 2 (Ind.2001) ("[t]o the extent it is an argument concerning counsel's own ineffectiveness, it cannot be raised"), *cert. denied*, 537 U.S. 839, 123 S.Ct. 162, 154 L.Ed.2d 61 (2002).

Moving now to the conclusion that the trial court committed fundamental error in failing to initiate an inquiry into jury intimidation, as I see it, the Majority opinion in effect creates a rule that the failure to employ *Lindsey* procedures in cases such as this is per se fundamental, and thus reversible, error. I draw this conclusion from the Majority's rejection of the State's harmless error argument. According to the harmless error doctrine, "[a]n error is harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect a party's substantial rights." *Brown v. State*, 770 N.E.2d 275, 280 (Ind.2002). The State claims the doctrine applies here to defeat Caruthers's claim of fundamental error, and I agree.

The considerable and compelling evidence of guilt need not be recounted again in detail. It included the establishment of motive, eyewitnesses placing Caruthers at the scene of the murder, shooting a weapon, and claiming, "Man, I think I got him." *Transcript* at 523. It also included a subsequent admission to a friend that he shot the victim by mistake, an attempt to sanitize and get rid of the murder weapon, and forensic ballistic evidence connecting Ca-

ruthers to the shooting. Unless we reject the damning testimony of several witnesses on the basis of Caruthers's "incredible dubiosity" argument—an argument neither my colleagues nor I accept-the evidence of guilt was considerable, even overwhelming. The Majority acknowledges the strength of the evidence in determining that Caruthers may be retried consistent with double jeopardy principles.

Against this evidence stands the bailiff's report to the judge during trial that members of the jury had expressed concerns for their safety during trial as a result of unspecified actions of Caruthers, his family, and the victim's family. It is, I think, somewhat ironic that the Majority concludes that the trial court's curative measures settle the question once and for all that this was fundamental error, i.e.,

> Trial courts have discretion to deal with this type of problem. But in this case, where the trial court instituted protective measures known to the jury as a result of juror reports of being threatened, the trial court abused its discretion by not inquiring as to the impact of those threats on the jury's impartiality.

*Op.* at 510. I share my colleagues' views on the crucial importance of impartial jurors, as ably expressed in the discussion of Issue I in the majority opinion, but I cannot agree that what occurred here created an "egregious circumstance[ ]", *Brown v. State*, 799 N.E.2d 1064, 1068 (Ind.2003), that was "'so prejudicial to the rights of the defendant as to make a fair trial impossible.'" *Benson v. State*, 762 N.E.2d 748, 755 (Ind.2002) (quoting *Willey v. State*, 712 N.E.2d 434, 444–45 (Ind.1999)). In my view, although the court should have inquired further as to the effect on the jury, if any, of the alleged actions, the failure to do so did not rise to the level of fundamental error. Thus, I would dispose

of this argument by noting that it has not been preserved. *See Carter v. State,* 754 N.E.2d 877 (Ind.2001) (an appellate court need only expound upon those contentions of fundamental error that it thinks warrant relief; otherwise, it is enough to note that the claim has not been preserved), *cert. denied,* 537 U.S. 831, 123 S.Ct. 135, 154 L.Ed.2d 47 (2002). I would affirm the conviction.