## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 17 2016, 8:45 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Michael R. Fisher
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Harley R. Sims,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

February 17, 2016

Court of Appeals Case No.
49A02-1507-CR-768

Appeal from the Marion Superior Court

The Honorable Sheila A. Carlisle, Judge

Trial Court Cause No.
49G03-1401-MR-694

**Mathias, Judge.**

Harley Sims ("Sims") was convicted of murder in Marion Superior Court. Sims was ordered to serve fifty-five years in the Department of Correction, with two years suspended. Sims appeals and presents two issues, which we restate as:

I. Whether the evidence was sufficient to support Sims's murder conviction and;

II. Whether Sims's sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## Facts and Procedural History

In the Fall of 2013, Kristopher Griner ("Griner") met Tiffany Cooney ("Cooney"), and they developed a close friendship. It was a friendship that often involved the use of drugs.

On the evening of January 1, 2014, Griner called Cooney and asked her to pick him up because he wanted to hang out with her, but he was stranded in Columbus, Indiana. Thereupon, Cooney drove to Columbus, picked up Griner, and they drove to a friend's house on the west side of Indianapolis.

After they arrived at the home, Cooney determined that she needed money for gas and drugs. Sims was also at the friend's house when Cooney and Griner arrived. This was the first time that Cooney and Sims had met. Sims offered to buy Cooney some gas if she helped him run a few errands. Cooney agreed, and she and Sims left Griner at the friend's house because he was taking a nap. Both Cooney and Sims used methamphetamine before leaving the house.

[6] Sims and Cooney drove around Indianapolis for several hours, making various stops in her black Ford Ranger pickup truck. Cooney allowed Sims to drive after they stopped to get gas because her legs were "tired." Tr. p. 45. Later in the evening, Griner began impatiently texting Cooney and asked her to come pick him up from the friend's house because he was "sick" for heroin. Tr. p. 50. So, Sims and Cooney picked up Griner and continued to run errands for Sims. This was the first occasion that Sims met Griner. Cooney sat in the middle seat next to Sims, who drove, and Griner sat in the passenger seat. Griner was agitated and repeatedly told Cooney that they needed to hurry up and that Sims was "taking too much time." Tr. p. 51. Griner elbowed Cooney in the ribs several times, but he stopped after she told him that he was hurting her. Cooney observed that Sims was bothered by Griner's behavior and shook his head in disapproval.

[7] Around the same time, Sims suggested that they find a Wi-Fi network so that he could contact a friend on Facebook. Sims pulled into the parking lot at the Hyatt hotel near the airport because he knew it would have an unrestricted Wi-Fi network. After pulling into the parking lot, Sims leaned Cooney forward until her face hit the radio, reached behind her, and stabbed Griner in the neck with a pocketknife that Cooney kept near the driver side seatbelt in her truck. Cooney initially thought that Sims hit Griner, but when she sat up she saw Sims holding her knife with Griner's blood on it. Griner screamed profanities at Sims, jumped out of the truck, and ran toward the hotel. Cooney attempted to

follow Griner to see what had happened, but Sims pulled Cooney back into the truck and quickly drove away from the hotel.

[8]     Griner entered the hotel lobby around 2:30 a.m. on January 2, 2014, and called for help. Night auditor, Curtis Baker ("Baker"), was on duty at the Hyatt hotel that evening. Baker saw blood coming out of Griner's neck, so he helped him sit down on a couch, went to get Griner some towels, and called 911. While Baker was on the phone, Griner became unconscious and slid off the couch and onto the floor. The lobby video surveillance captured this entire incident. When Indianapolis Metropolitan Police Department ("IMPD") Officer James Barrow ("Officer Barrow") arrived at the hotel lobby, Griner was unresponsive and "his clothing was heavily drenched in blood." Tr. p. 32. Griner was transported to the hospital, where he was pronounced dead after attempts to resuscitate him were made. The coroner determined that a stab wound to the neck severed Griner's left subclavian artery and vein, causing his death. Tr. p. 180-81.

[9]     Cooney stayed with Sims for several days after Griner was stabbed because Sims threatened that if she tried to leave, call the police, or speak to anyone about the incident that "he wouldn't think twice to do the same to [her]." Tr. p. 63. He also took Cooney's cell phone, and when the police called for her, Sims hung up the phone. Sims and Cooney stopped at various locations around Indianapolis, looking for money and a place to stay. A friend of Sims's mother, R. Thomas Garrett ("Garrett"), finally agreed to let them stay at his house, where the two were finally apprehended by police on January 6, 2014. Detective Brian Lemond ("Detective Lemond") interviewed both Cooney and

Sims. Cooney told Detective Lemond that Sims stabbed Griner. Sims admitted that he "took a swipe at him" with a pocketknife. Tr. p. 351.

[10] The State charged Sims with murder on January 8, 2014. A jury trial was held on February 9 and 10, 2015. The jury convicted Sims. A sentencing hearing was held on June 24, 2015, and the trial court ordered Sims to serve fifty-five years in the Department of Correction, with two years suspended to probation. The trial court determined Sims's sincere apology to Griner's family and history of childhood abuse to be mitigating factors. The court considered Sims's previous theft conviction and arrest for domestic battery as an aggravating factor. The trial court also gave significant aggravating weight to the the nature of the offense. Sims now appeals.

## I. Sufficiency of the Evidence

[11] Sims argues that his murder conviction was not supported by sufficient evidence. "Upon a challenge to the sufficiency of evidence to support a conviction, a reviewing court does not reweigh the evidence or judge the credibility of witnesses, and respects the jury's exclusive province to weigh conflicting evidence." *Montgomery v. State*, 878 N.E.2d 262, 265 (Ind. Ct. App. 2007) (quoting *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005)). We consider only probative evidence and reasonable inferences supporting the verdict. *Id.* We must affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.*

Sims was charged with "knowingly killing another human being, namely: Kristopher Griner by stabbing at and against the person of Kristopher Griner with a knife, thereby inflicting mortal injuries upon Kristopher Griner, causing [him] to die." Appellant's App. p. 25. Indiana Code section 35-42-1-1(1) provides:

> A person who knowingly or intentionally kills another human being commits murder, a felony.

Sims specifically contends that the Stated failed to prove that he acted knowingly. One "knowingly" kills when he is "aware of a high probability" that his conduct might kill. *Griffin v. State*, 963 N.E.2d 685, 692 (Ind. Ct. App. 2012) (citing *Etienne v. State*, 716 N.E.2d 457, 463 (Ind. 1999)); Ind. Code § 35-41-2-2(b). "The requisite intent to commit murder may be inferred from the intentional use of a deadly weapon in a manner likely to cause death." *Davis v. State*, 558 N.E.2d 811, 812 (Ind. 1990).

Cooney testified at trial that in the early morning hours of January 2, 2014, Sims leaned her all the way forward in her truck until her head touched the radio, reached behind her, and hit Griner. However, when she looked at Sims to tell him to stop fighting, she saw a bloody knife in Sims's hand and Griner was screaming in pain. When Cooney attempted to exit the truck to determine if Griner was injured, Sims pulled her back in the truck, quickly drove off, and threatened her not to discuss the incident with anyone. He also later admitted to police that he "took a swipe" at Griner with a pocketknife. Tr. p. 351.

Sims was aware of a high probability that his conduct might kill Griner because he lunged at his neck with a knife. Cooney's testimony establishes that Sims knowingly killed Griner. Sims relies on his own testimony that he acted in self defense because Griner swung a hammer at him. The jury had the discretion to weigh Cooney's testimony against Sims's testimony. We must respect this discretion. *See McHenry,* 820 N.E.2d at 126.

Sims also argues that the State failed to prove that he was not acting in sudden heat when he stabbed Griner with a knife. Under Indiana Code section 35-42-1-3(a)(1)[1],

> A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter, a Class B felony. However, the offense is a Class A felony if it is committed by means of a deadly weapon.
>
> (b) The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder under section 1(1) of this chapter to voluntary manslaughter.

"Sudden heat" is characterized as anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection. *Suprenant v. State*, 925 N.E.2d 1280, 1282 (Ind. Ct. App. 2010).

---

[1] We note that, effective July 1, 2014, the statute was amended. However, because Sims committed his crime prior to this revision, we refer to the statute in effect at that time.

Sudden heat requires more than mere words and must be sufficient to meet an objective standard. *Id.* at 1282-83.

[17] Cooney testified that after she and Sims picked up Griner, Sims was frustrated by Griner's need for heroin and shook his head in disapproval. Griner also elbowed Cooney in the ribs to express his frustration with how long Sims's errands were taking. However, Cooney asked Griner to stop and he did. Based on these facts and circumstances, the jury determined that Sims did not act in sudden heat when he stabbed Griner in the neck. Again, we respect the jury's discretion and will not reweigh the evidence. *See McHenry,* 820 N.E.2d at 126. For all of these reasons, we conclude that the State presented sufficient evidence to support Sims's murder conviction.

## II. Inappropriate Sentence

[18] Sims further argues that his sentence is inappropriate in light of the nature of the offense and the character of the offender. Under Indiana Appellate Rule 7(B):

> [We] may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender.

When reviewing a sentence, our principal role is to "leaven the outliers" rather than necessarily achieve what is perceived as the "correct" result. *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). We do not look to determine if the sentence

was appropriate; instead we look to make sure the sentence was not inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference. *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008) (citing *Morgan v. State*, 675 N.E.2d 1067, 1072 (Ind. 1996)). Therefore, the defendant has the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[19] The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed in assessing the nature of the offense. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007). The "character of the offender" portion of the sentence involves consideration of the aggravating and mitigating circumstances and general considerations. *Clara v. State*, 899 N.E.2d 733, 736 (Ind. Ct. App. 2009).

[20] Sims was convicted of murder. At the time of Sims's offense, the sentencing range for murder was forty-five to sixty-five years, with fifty-five years being the advisory sentence. *See* Ind. Code § 35-50-2-3. The trial court imposed a fifty-five-year sentence to be served in the Department of Correction, with two years suspended to probation.

[21] In considering the nature of the offense, we observe that Sims stabbed Griner in the neck because he was frustrated with Griner's behavior toward Cooney and his repeated requests for heroin. Instead of determining if Griner was injured or

seeking help for him after Griner exited the truck, Sims drove off, and evaded the police for four days. When the police called Cooney's cell phone and asked to speak to her, Sims hung up the phone. He threatened Cooney that if she told anyone what had happened that "he wouldn't think twice to do the same to [her]." Tr. p. 63. Sims also lied in his statement to the police. These are all actions that properly enhance the nature of the offense.

At the sentencing hearing, in addition to the offense-based aggravators, the trial court determined that Sims's prior criminal history did not speak well for his character. We give considerable deference to the trial court's sentencing discretion and conclude the court's imposition of an advisory fifty-five-year sentence with two years suspended to probation was not inappropriate in light of the nature of the offense and the character of the offender.

## Conclusion

The State presented sufficient evidence to support Sims's murder conviction. Additionally, Sims's fifty-five-year sentence imposed by the trial court was not inappropriate in light of the nature of the offense and the character of the offender.

Affirmed.

Kirsch, J., and Brown, J., concur.